# 22-1600(L)

## 22-2063(CON), 23-6819(CON)

*To Be Argued By*:
SARAH MORTAZAVI

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket Nos. 22-1600(L), 22-2063(CON), 23-6819(CON)

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

SETH FISHMAN, LISA GIANNELLI,

*Defendants-Appellants*,

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

DAVID R. FELTON,
MICHAEL D. MAIMIN,
SARAH MORTAZAVI,
*Assistant United States Attorneys,
Of Counsel.*

JORGE NAVARRO, ERICA GARCIA, MARCOS ZULUETA, MICHAEL TANNUZZO, GREGORY SKELTON, ROSS COHEN, JORDAN FISHMAN, RICK DANE, JR., CHRISTOPHER OAKES, JASON SERVIS, KRISTIAN RHEIN, MICHAEL KEGLEY, JR., ALEXANDER CHAN, HENRY ARGUETA, NICHOLAS SURICK, REBECCA LINKE, CHRISTOPHER MARINO,

*Defendants.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

POINT I—The District Court Did Not Err When
   It Denied Giannelli's Motion to Dismiss the
   Indictment and Instructed Fishman's Jury
   Consistent with the Charged Statute . . . . . . . .  8

   A.  Section 333(a)(2) Criminalizes Any
   Violation of Section 331 Committed
   with the Intent to Defraud or Mislead . . . .  8

   B.  The District Court Properly Denied the
   Motion to Dismiss the Indictment . . . . . . .  22

      1.  Applicable Law . . . . . . . . . . . . . . . . . . .  23

      2.  Discussion . . . . . . . . . . . . . . . . . . . . . .  24

   C.  The District Court Properly Charged
   Fishman's Jury . . . . . . . . . . . . . . . . . . . . . . .  26

      1.  Relevant Facts . . . . . . . . . . . . . . . . . . .  27

      2.  Applicable Law . . . . . . . . . . . . . . . . . . .  28

      3.  Discussion . . . . . . . . . . . . . . . . . . . . . .  31

ii

PAGE

POINT II—The District Court Did Not Plainly
Err When It Admitted Evidence of
Giannelli's Awareness of, and Lies to
Authorities in Connection With, a
Delaware Investigation into Her and
Fishman's Drug-Distribution Scheme . . . . . . . 38

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 39

    B.  Standard of Review. . . . . . . . . . . . . . . . . . . 41

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 43

POINT III—Fishman's Sentence Was
Procedurally Reasonable. . . . . . . . . . . . . . . . . 47

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 47

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 51

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 52

POINT IV—The District Court Did Not Abuse
Its Discretion in Imposing Restitution. . . . . . . 55

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 57

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 59

POINT V—The District Court Did Not Plainly
Err by Ordering Forfeiture . . . . . . . . . . . . . . . 63

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . 65

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 67

iii

PAGE

1.  Fishman Forfeited His Objection
    to the Lawfulness of Forfeiture. . . . . .  67

2.  The District Court Did Not
    Commit Plain Error. . . . . . . . . . . . . .  69

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

iv

PAGE

# TABLE OF AUTHORITIES

*Cases*:

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008). . . . . . . . . . . . . . . . . . . . . . . . 11

*Est. of Cowart v. Nicklos Drilling Co.*,
505 U.S. 469 (1992). . . . . . . . . . . . . . . . . . . . . . . . 10

*Food Mktg. Inst. v. Argus Leader Media*,
139 S. Ct. 2356 (2019). . . . . . . . . . . . . . . . . . . . . . 12

*Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of
Chicago*,
747 F.2d 384 (7th Cir. 1984) . . . . . . . . . . . . . . . . 13

*Hernandez v. New York*,
500 U.S. 352 (1991). . . . . . . . . . . . . . . . . . . . . . . . 52

*Huddleston v. United States*,
485 U.S. 681 (1988). . . . . . . . . . . . . . . . . . . . . . . . 42

*Lamie v. U.S. Trustee*,
540 U.S. 526 (2004). . . . . . . . . . . . . . . . . . . . . . . . 10

*Lee v. Thornton*,
538 F.2d 27 (2d Cir. 1976) . . . . . . . . . . . . . . . . . 70

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
486 U.S. 825 (1988). . . . . . . . . . . . . . . . . . . . . . . . 19

*Neder v. United States*,
527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . 29

v

PAGE

*Niagra Mohawk Power Corp. v. Hudson River-
    Black River Reg. Dist.*,
    673 F.3d 84 (2d Cir. 2012) . . . . . . . . . . . . . . . 27, 33

*Raila v. United States*,
    355 F.3d 118 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 10

*Schacht v. Brown*,
    711 F.2d 1343 (7th Cir. 1983) . . . . . . . . . . . . . . . 13

*Sullivan v. Stroop*,
    496 U.S. 478 (1990). . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. 52 Drums Maple Syrup*,
    110 F.2d 914 (2d Cir. 1940) . . . . . . . . . . . . . . . . 70

*United States v. Agrawal*,
    726 F.3d 235 (2d Cir. 2013) . . . . . . . . . . . . . 43, 44

*United States v. Alli-Balogun*,
    72 F.3d 9 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . 32

*United States v. Amalfi*,
    47 F.4th 114 (2d Cir. 2022) . . . . . . . . . . . . . . . . 23

*United States v. An Article of Food*,
    752 F.2d 11 (1st Cir. 1985). . . . . . . . . . . . . . . . . 71

*United States v. Arlen*,
    947 F.2d 139 (5th Cir. 1991) . . . . . . . . .   10, 16, 24

*United States v. Articles of Drug for Veterinary
    Use*,
    50 F.3d 497 (8th Cir. 1995) . . . . . . . . . . . . . . . . 71

*United States v. Articles of Drug*,
    826 F.2d 564 (7th Cir. 1987) . . . . . . . . . . . . . . . 71

vi

PAGE

*United States v. Awad,*
   598 F.3d 76 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . 66

*United States v. Baig,*
   669 F. App'x 587 (2d Cir. 2016) . . . . . . . . . . . . . . 63

*United States v. Bala,*
   236 F.3d 87 (2d Cir. 2000) . . . . . . . . . . . . . . . 29, 31

*United States v. Ballistrea,*
   101 F.3d 827 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 14

*United States v. Bayfield,*
   796 F. App'x 19 (2d Cir. 2019) . . . . . . . . . . . . . . . 46

*United States v. Beeech-Nut Nutrition Corp.,*
   871 F.2d 1181 (2d Cir. 1989) . . . . . . . . . . . . . . . . 33

*United States v. Bermudez,*
   413 F.3d 304 (2d Cir. 2005) . . . . . . . . . . . . . . 66, 73

*United States v. Botti,*
   711 F.3d 299 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 37

*United States v. Bradshaw,*
   840 F.2d 871 (11th Cir. 1988) . . . . . . . .   15, 16, 20

*United States v. Cambra,*
   933 F.2d 752 (9th Cir. 1991) . . . . . . . . . . . . . . . . 16

*United States v. Carboni,*
   204 F.3d 39 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 54

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 51

*United States v. Concepcion,*
   983 F.2d 369 (2d Cir. 1992) . . . . . . . . . . . . . . 45, 62

vii

PAGE

*United States v. Crowley*,
  318 F.3d 401 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 26

*United States v. Daniel*,
  570 F. App'x 14 (2d Cir. 2014) . . . . . . . . . . . . . . 46

*United States v. Davis*,
  648 F.3d 84 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 72

*United States v. Dawkins*,
  999 F.3d 767 (2d Cir. 2021) . . . . . . . . . . . . . . . . 23

*United States v. De La Pava*,
  268 F.3d 157 (2d. Cir. 2001) . . . . . . . . . . . . . . . . 23

*United States v. Dessart*,
  823 F.3d 395 (7th Cir. 2016) . . . . . . . . . . . . . . . . 14

*United States v. Eberhard*,
  525 F.3d 175 (2d Cir. 2008) . . . . . . . . . . . . . . . . 54

*United States v. Eight Unlabeled Cases:, more or
  less, of an Article of Cosm.*,
  888 F.2d 945 (2d Cir. 1989) . . . . . . . . . . . . . . . . 71

*United States v. Felder*,
  993 F.3d 57 (2d Cir. 2021) . . . . . . . . . . . . . . 43, 44

*United States v. Fofanah*,
  765 F.3d 141 (2d Cir. 2014) . . . . . . . . . . . . . . . . 29

*United States v. Goldberg*,
  661 F. App'x 33 (2d Cir. 2016) . . . . . . . . . . . . . . 67

*United States v. Graham*,
  51 F.4th 67 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 42

viii

PAGE

*United States v. Grant,*
  235 F.3d 95 (2d Cir. 2000) . . . . . . . . . . . . . . . 58, 60

*United States v. Grissom,*
  645 F.2d 461 (5th Cir. 1981) . . . . . . . . . . . . . . . 20

*United States v. Gushlak,*
  728 F.3d 184 (2d Cir. 2013) . . . . . . . . . . . . . . 58, 59

*United States v. Haga,*
  821 F.2d 1036 (5th Cir. 1987) . . . . . . . . . . . 16, 18

*United States v. Hunt,*
  82 F.4th 129 (2d Cir. 2023) . . . . . . . . . . 30, 32, 69

*United States v. Indus. Labs. Co.,*
  456 F.2d 908 (10th Cir. 1972) . . . . . . . . . . . 15, 16

*United States v. Ismail,*
  219 F.3d 76 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 58

*United States v. James,*
  520 F. App'x 41 (2d Cir. 2013) . . . . . . . . . . . . . . 45

*United States v. Jass,*
  569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 54

*United States v. Kanasco, Ltd.,*
  123 F.3d 209 (4th Cir. 1997) . . . . . . . . . . . . . . . 71

*United States v. Kirk Tang Yuk,*
  885 F.3d 57 (2d Cir. 2018) . . . . . . . . . . . . . . 29, 32

*United States v. Lacey,*
  699 F.3d 710 (2d Cir. 2012) . . . . . . . . . . . . . 53, 54

*United States v. Leahy,*
  464 F.3d 773 (7th Cir. 2006) . . . . . . . . . . . . . . . 60

ix

PAGE

*United States v. Marcus,*
  560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Marcus,*
  628 F.3d 36 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 13

*United States v. Martinez,*
  413 F.3d 239 (2d Cir. 2005) . . . . . . . . . . . . . . . . 62

*United States v. Masotto,*
  73 F.3d 1233 (2d Cir. 1996) . . . . . . . . . . . . . . . . 30

*United States v. McPartland,*
  81 F.4th 101 (2d Cir. 2023) . . . . . . . . . . . . . 42, 43

*United States v. Middlemiss,*
  217 F.3d 112 (2d Cir. 2000) . . . . . . . . . . . . . . . . 30

*United States v. Milstein,*
  401 F.3d 53 (2d Cir. 2005) . . . . . . . . . . .  13, 14, 19

*United States v. Milstein,*
  481 F.3d 132 (2d Cir. 2007) . . . . . . . . . . . . . . . . 58

*United States v. Mitcheltree,*
  940 F.2d 1329 (10th Cir. 1991) . . . .  16, 17, 18, 35

*United States v. Morris,*
  23 U.S. 246 (1825). . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Moseley,*
  980 F.3d 9 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . 51

*United States v. Napout,*
  963 F.3d 163 (2d Cir. 2020) . . . . . . . . . . . . . . . . 43

*United States v. Norman,*
  776 F.3d 67 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 52

x

PAGE

*United States v. Orrego-Martinez,*
    575 F.3d 1 (1st Cir. 2009) . . . . . . . . .  10, 14, 25, 35

*United States v. Park,*
    33 F. App'x 1 (2d Cir. 2002) . . . . . . . . . . . . . . 58, 62

*United States v. Patwardhan,*
    422 F. App'x 614 (9th Cir. 2011) . . . . . . . . . . . . 15

*United States v. Pearson,*
    570 F.3d 480 (2d Cir. 2009) . . . . . . . . . . . . . . . . 59

*United States v. Qurashi,*
    634 F.3d 699 (2d Cir. 2011) . . . . . . . . . . . . . . . . 57

*United States v. Razmilovic,*
    419 F.3d 134 (2d Cir. 2005) . . . . . . . . . . . . . . . . 66

*United States v. Rivernider,*
    828 F.3d 91 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 58

*United States v. Robinson,*
    799 F.3d 196 (2d Cir. 2015) . . . . . . . . . . . . . . . . 51

*United States v. Rossi,*
    592 F.3d 372 (2d Cir. 2010) . . . . . . . . . .  58, 60, 62

*United States v. Scarpa,*
    913 F.2d 993 (2d Cir. 1990) . . . . . . . . . . . . . . . . 29

*United States v. Seabrook,*
    661 F. App'x 84 (2d Cir. 2016) . . . . . . . . . . . . 66, 73

*United States v. Strauss,*
    999 F.2d 692 (2d Cir. 1993) . . . . . . . . . . . . . . . . 21

*United States v. Stringer,*
    730 F.3d 120 (2d Cir. 2013) . . . . . . . . . . . . . . 23, 24

xi

PAGE

*United States v. Thai,*
29 F.3d 785 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . 45

*United States v. Thompson,*
792 F.3d 273 (2d Cir. 2015) . . . . . . . . . . . . . . . . 58

*United States v. Undetermined Quantities of All*
*Articles of Finished & In-Process Foods,*
936 F.3d 1341 (11th Cir. 2019) . . . . . . . . . . . . . 71

*United States v. Verkhoglyad,*
516 F.3d 122 (2d Cir. 2008) . . . . . . . . . . . . . . . . 55

*United States v. Vitek Supply Corp.,*
144 F.3d 476 (7th Cir. 1998) . . . . . . . . . 14, 26, 36

*United States v. Wedd,*
993 F.3d 104 (2d Cir. 2021) . . . . . . . . . . . . . 23, 24

*United States v. Weintraub,*
273 F.3d 139 (2d Cir. 2001) . . . . . . . . . . . . . . . . 30

*United States v. Williams,*
585 F.3d 703 (2d Cir. 2009) . . . . . . . . . . . . . . . . 43

*United States v. Woodard,*
459 F.3d 1078 (11th Cir. 2006) . . . . . . . . . . . . . 61

*United States v. Zapatero,*
961 F.3d 123 (2d Cir. 2020) . . . . . . . . . . . . . . . . 10

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 18

18 U.S.C. § 658 . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

xii

PAGE

18 U.S.C. § 981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

18 U.S.C. § 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

18 U.S.C. § 1002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 1006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 1014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 1347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 1589 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 3147 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 48

18 U.S.C. § 3663A . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

18 U.S.C. § 3664 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

19 U.S.C. § 1595a . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

19 U.S.C. § 1609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

19 U.S.C. § 1610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

21 C.F.R. § 7.84(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21 U.S.C. § 331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. § 333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

21 U.S.C. § 334 . . . . . . . . . . . . . . . . . . . . . . . 65, 70, 72, 73

21 U.S.C. § 335 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

21 U.S.C. § 343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21 U.S.C. § 853 . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

xiii

PAGE

28 U.S.C. § 2461 . . . . . . . . . . . . . . . . 66, 69, 71, 72, 73

50 U.S.C. § 4301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

50 U.S.C. § 4315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

3 DEL. ADMIN CODE § 501-8.1 . . . . . . . . . . . . . . . . . 35

3 DEL. ADMIN CODE § 501-8.7.1.2 . . . . . . . . . . . . . . 35

3 DEL. ADMIN CODE § 1011.15.1.1 . . . . . . . . . . . . . . 35

3 DEL. ADMIN CODE § 1011.15.12.1 . . . . . . . . . . . . . 35

FED. R. CRIM. P. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FED. R. CRIM. P. 30 . . . . . . . . . . . . . . . . . . . . . . . 29, 30

FED. R. CRIM. P. 32.2 . . . . . . . . . . . . . . . . . . 64, 68, 69

FED. R. CRIM. P. 52 . . . . . . . . . . . . . . . . . . . . . . . . . . 43

FED. R. EVID. 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

FED. R. EVID. 403 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

FED. R. EVID. 404 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

FED. R. EVID. 1101 . . . . . . . . . . . . . . . . . . . . . . . . . . 62

FLA. ADMIN. CODE § 61D-6.001 . . . . . . . . . . . . . . . . 35

FLA. ADMIN. CODE § 61D-6.003 . . . . . . . . . . . . . . . . 35

FLA. ADMIN. CODE § 61D-6.008 . . . . . . . . . . . . . . . . 35

FLA. ADMIN. CODE § 61D-6.011 . . . . . . . . . . . . . . . . 35

FLA. STAT. § 550.2415 . . . . . . . . . . . . . . . . . . . . . . . . 35

xiv

PAGE

Horseracing Integrity and Safety Act of 2020,
    PUB. L. 116-260, div. FF, title XII, §§ 1201–12,
    134 Stat. 3252–75 (Dec. 27, 2020) . . . . . . . . . . . 19

N.J. ADMIN. CODE § 13:70-14A.1 . . . . . . . . . . . . . . . 35

N.J. ADMIN. CODE § 13:70-27.2 . . . . . . . . . . . . . . . . 35

9 NYCRR § 4002.9 . . . . . . . . . . . . . . . . . . . . . . . . . . 35

9 NYCRR § 4012.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 34

9 NYCRR § 4042.5 . . . . . . . . . . . . . . . . . . . . . . . . . . 35

9 NYCRR § 4043.2 . . . . . . . . . . . . . . . . . . . . . . . . . . 35

9 NYCRR § 4043.12 . . . . . . . . . . . . . . . . . . . . . . . . . 35

9 NYCRR § 4043.16 . . . . . . . . . . . . . . . . . . . . . . . . . 35

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . .   48, 51, 52, 53

U.S.S.G. § 2X1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . 48

U.S.S.G. § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

U.S.S.G. § 3B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

U.S.S.G. § 3C1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE SECOND CIRCUIT

## Docket Nos. 22-1600(L), 22-2063(CON), 23-6819(CON)

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JORGE NAVARRO, ERICA GARCIA, MARCOS ZULUETA, MICHAEL TANNUZZO, GREGORY SKELTON, ROSS COHEN, JORDAN FISHMAN, RICK DANE, JR., CHRISTOPHER OAKES, JASON SERVIS, KRISTIAN RHEIN, MICHAEL KEGLEY, JR., ALEXANDER CHAN, HENRY ARGUETA, NICHOLAS SURICK, REBECCA LINKE, CHRISTOPHER MARINO,

*Defendants,*

SETH FISHMAN, LISA GIANNELLI,

*Defendant-Appellants.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

## Preliminary Statement

Seth Fishman appeals from an amended judgment of conviction entered on July 14, 2023, and an order of forfeiture/money judgment entered on July 10, 2023,

2

and Lisa Giannelli appeals from a judgment of conviction entered on September 9, 2022, in the United States District Court for the Southern District of New York, by the Honorable Mary Kay Vyskocil, United States District Judge, following separate jury trials.

Indictment S6 20 Cr. 160 (MKV) (the "Indictment") was filed on November 5, 2020, in five counts. Relevant here, Count One charged Fishman and five co-defendants with participating in a conspiracy to violate the laws of the United States—in particular, to violate 21 U.S.C. §§ 331 and 333(a)(2)—in violation of 18 U.S.C. § 371; and Count Two charged Fishman, Giannelli, and two co-conspirators with participating in a conspiracy to violate the laws of the United States—in particular, to violate 21 U.S.C. §§ 331 and 333(a)(2)—in violation of 18 U.S.C. § 371, including while Fishman was released under conditions of bail, in violation of 18 U.S.C. § 3147.

On February 2, 2022, a jury found Fishman guilty of participating in two conspiracies to violate 21 U.S.C. §§ 331 and 333(a)(2), and that Fishman committed part of one of the offenses while released under conditions of bail. On May 6, 2022, a different jury found Giannelli guilty of participating in a conspiracy to violate 21 U.S.C. §§ 331 and 333(a)(2).

On July 11, 2022, Judge Vyskocil sentenced Fishman to a term of 132 months' imprisonment, to be followed by three years' supervised release, and imposed a $250,000 fine, $25,860,514 in restitution, $13,503,176.20 in forfeiture, and a $200 mandatory special assessment; on July 10, 2023, Judge Vyskocil reduced the forfeiture amount to $10,312,627.40.

3

On September 8, 2022, Judge Vyskocil sentenced Giannelli to a term of 42 months' imprisonment, to be followed by two years' supervised release, and imposed a $100,000 fine, $900,000 in forfeiture, and a $100 mandatory special assessment.

The defendants are serving their sentences.

## Statement of Facts

For years, Fishman manufactured and sold adulterated and misbranded performance-enhancing drugs ("PEDs"), targeting clients in the racehorse industry. (Fishman PSR ¶¶ 13–14, 29, 94; Giannelli PSR ¶¶ 13–14, 26).[1] Jorge Navarro was a racehorse trainer

---

[1]    "[Defendant] PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office in connection with that defendant's sentencing; "[Defendant] Br." refers to that defendant's brief on appeal; "[Defendant] A." refers to the appendix filed with that defendant's brief on appeal; "SA" refers to the supplemental appendix filed with Fishman's brief on appeal; "[Defendant] Tr." refers to that defendant's trial transcript; "GX" refers to a Government exhibit admitted at one or both of the defendants' trials (which exhibits had consistent exhibit numbers between the trials); "Amicus Br." refers to a proposed amicus brief in this appeal, available at Docket Entry 125-2; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, citations omit all internal quotation marks, case and record citations, footnotes, and previous alterations.

4

who orchestrated a widespread scheme of covertly obtaining and administering various adulterated and misbranded PEDs—typically designed to evade drug tests—to the racehorses under his control; Fishman conspired with Navarro in this scheme. (Fishman PSR ¶¶ 25–28; Giannelli PSR ¶¶ 20–23). Navarro was prolific: from 2018 to February 2020, he entered horses in approximately 1,480 races. (Fishman PSR ¶ 25; Giannelli PSR ¶ 20).

Fishman also ran a separate scheme to sell PEDs to other trainers; Giannelli—a former racehorse trainer who holds no medical or pharmaceutical license—was Fishman's principal sales representative in this scheme, re-distributing PEDs to buyers throughout the northeast United States. (Fishman PSR ¶¶ 29–31; Giannelli PSR ¶¶ 26–28, 37). Fishman's and Giannelli's clients sought to improve their racehorses' performances by "doping" them to win prize money—sometimes in excess of a million dollars for a race—from racetracks. (Fishman PSR ¶¶ 14, 79; Giannelli PSR ¶¶ 14, 81). Fishman and Giannelli marketed, sold, and distributed adulterated and misbranded animal drugs through a company they named Equestology; Equestology made millions of dollars during Fishman and Giannelli's conspiracy, and Giannelli personally made approximately $900,000. (Giannelli PSR ¶¶ 37, 96; Fishman A. 279, 281, 284; Fishman SA 49; Dkt. 941 at 14).

Fishman's crime was simple: he and his co-conspirators, including Giannelli, created and produced (or directed others to produce) scores of new PEDs that were adulterated and/or misbranded for a number of

5

reasons, including because they: (1) were not manufactured in facilities registered with the U.S. Food and Drug Administration (the "FDA"); (2) were labeled with deficient or misleading information; (3) were not dispensed pursuant to valid veterinary prescriptions; and (4) lacked requisite FDA approval. (Fishman PSR ¶ 29; Giannelli PSR ¶ 26). One of the key draws of Fishman's PEDs was that they could not be detected through drug-testing; accordingly, between the mislabeling and ability to evade detection, horse trainers could administer the PEDs—and win races illegitimately—without the racetracks or regulators finding out. (*See*, *e.g.*, GX 3325 (a customer e-mailing Fishman to ask "about the drugs that you can make so to not appear in test"), 3402 (Fishman e-mailing "As for doping I make all my products non testable.")). Fishman boasted that he "make[s] custom bioengineered products" and "[o]wners prefer to pay more for exotic stuff knowing that they are less likely to get caught." (GX 401-E, 401-Q). Some of the PEDs were injectables that would cause a horse pain, and that could have dangerous effects if administered incorrectly. (GX 139A-T).

Although Fishman was a licensed veterinarian, he did not: practice veterinary medicine in connection with his drug sales; examine, treat, and diagnose racehorses; or issue prescriptions for the drugs he distributed. (Fishman PSR ¶ 30; Giannelli PSR ¶ 27). And Giannelli offered to sell Fishman's drugs on demand, without regard to the existence of any prescription, the medical need for such drugs, or the legality (or propriety) of selling such drugs directly to racehorse trainers. (Fishman PSR ¶ 30; Giannelli PSR ¶ 27).

6

In distributing these drugs, including Fishman's custom-made blood builder, Fishman and Giannelli catered to racehorse trainers looking to gain a competitive edge—to cheat—by doping racehorses to improve their race performance, and were squarely focused on ensuring that they and their customers would not get caught doing so. (Fishman PSR ¶ 32; Giannelli PSR ¶ 29). To that end, Fishman and Giannelli vetted, and discussed whether they could trust, new clients before selling to them and blacklisted indiscreet trainers. (Fishman PSR ¶ 32; Giannelli PSR ¶¶ 29, 36; *see, e.g.*, GX 1915 (reference to risk of "a snitch [turning] a bottle in"); 119A-T (discussing whether a buyer could be trusted), 320FK (same), 320FA (same), 319I (Fishman asking Giannelli, "You trust him?"), 320FH (Giannelli offering to "ask around" about a particular buyer to determine if he can be trusted)).

Fishman and Giannelli knew that secrecy and deception were of paramount importance, and intended to mislead or defraud multiple state and federal agencies and entities through various deceptive tactics, including by listing misleading information on the labels of Fishman's drugs to make them appear innocuous if they were to be found in a barn search or in Giannelli's possession; designing drugs to be untestable on standard drug screens; and misrepresenting shipments of drugs to conceal the nature and apparent purpose of the drugs contained in those shipments. (Fishman PSR ¶¶ 32, 33; Giannelli PSR ¶¶ 29, 30; *see, e.g.*, GX 139C-T (Giannelli telling Fishman, "we're not looking to put a spotlight on us either"), 1915 ("the labs could never detect unless a snitch tuned [sic] a bottle in and the racing authorities decided to make a test.")).

7

And Fishman's PEDs worked. After Navarro won a $1.5 million purse with a doped racehorse—XY Jet—Fishman texted Navarro "Congratulations, just saw your race," and Navarro responded "Thank u, boss u are a big part of it." (GX 401-K; Fishman Tr. 693–94; Fishman PSR ¶ 79). As another example, Adrienne Hall—a trainer—and Fishman spoke about a doped racehorse who Hall explained "dominated" and "won by five lengths. I mean he was a completely different animal." (GX 105B-T; Fishman Tr. 801–23).

Even after Fishman was criminally charged by complaint in October 2019 and was released on bail, he continued his drug distribution business. (Fishman PSR ¶ 94; Giannelli PSR ¶ 97). Indeed, Fishman continued to supply Giannelli with the same PEDs that he had been distributing and marketing prior to his arrest, and relied on Giannelli to continue making sales while he maintained a low profile. (*See, e.g.*, GX 320FM, 403-C, 314B, D–F, Q–S).

Fishman and Giannelli exercised their rights to go to trial. A jury found that Fishman was guilty on both counts with which he was charged—Counts One and Two—with intent to defraud or mislead, and that he committed Count Two in part after he was released on bail. A different jury found that Giannelli was guilty on the sole count with which she was charged—Count Two—with intent to defraud or mislead.

# ARGUMENT

## POINT I

### The District Court Did Not Err When It Denied Giannelli's Motion to Dismiss the Indictment and Instructed Fishman's Jury Consistent with the Charged Statute

Fishman and Giannelli were charged with, and convicted of, conspiring to violate 21 U.S.C. § 333(a)(2), which is, on its face, a general fraud statute, criminalizing violations of 21 U.S.C. § 331 where such violations are committed "with the intent to defraud or mislead." However, Fishman and Giannelli each argue that Section 333(a)(2) nevertheless contains an additional element, nowhere to be found in the text: that the entities intended to be defrauded not be state racing regulators. (Fishman Br. 31–44; Giannelli Br. 13–18). Accordingly, Giannelli argues that the District Court erred by failing to dismiss the indictment (Giannelli Br. 18), and Fishman argues that the District Court erred by instructing the jury that it could convict Fishman if he intended to defraud state racing regulators (Fishman Br. 44–49). They are wrong.

### A. Section 333(a)(2) Criminalizes Any Violation of Section 331 Committed with the Intent to Defraud or Mislead

Both Giannelli's argument on appeal that the District Court erred in failing to dismiss the indictment, and Fishman's argument on appeal that the District Court instructed the jury incorrectly rely on their

9

interpretation of the mens rea required by 21 U.S.C. § 333(a)(2). Contrary to their arguments, although the statute requires an intent to defraud or mislead, it does not require that a particular person or entity be the object of the fraud.

The Indictment charged Fishman with participating in two Section 371 conspiracies, and Giannelli with participating in one of those conspiracies, to violate the laws regarding adulterating and misbranding drugs, and doing so with the intent to defraud or mislead, in violation of 21 U.S.C. §§ 331 and 333(a)(2), which are each part of the Food, Drug, and Cosmetic Act of 1938 (the "FDCA"). (Fishman A. 148–51, 154–56). Relevant here, Section 331 prohibits the introduction or delivery of adulterated or misbranded drugs, the adulteration or misbranding of drugs, the receipt of adulterated or misbranded drugs, and the alteration, mutilation, destruction, obliteration, or removal of the labeling of a drug resulting in its adulteration or misbranding. 21 U.S.C. § 331(a)–(c), (k). Section 333(a)(1) makes it a misdemeanor to violate Section 331; Section 333(a)(2) makes it a felony to do so with the intent to defraud or mislead:

> if any person . . . commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both.

21 U.S.C. § 333(a)(2). The statute does not indicate that any particular person or entity must be the subject of the fraud; accordingly, "[t]he elements of a § 333[(a)(2)] violation are (1) a violation of § 331,

10

(2) committed by . . . someone 'with the intent to defraud or mislead.'" *United States v. Arlen*, 947 F.2d 139, 145 (5th Cir. 1991);[2] *see also*, *e.g.*, *United States v. Orrego-Martinez*, 575 F.3d 1, 7 (1st Cir. 2009) (per curiam) (quoting *Arlen* to establish the elements of a Section 333(a)(2) violation).

In light of the plain text of the statute—all that is required is an "intent to defraud or mislead"—there is no hidden or implicit requirement that a defendant must defraud or mislead a particular person or entity. After all, "[t]he controlling principle . . . is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992). Here, this Court's "analysis begins with the plain text of § [331(a)(2),] and, because of the unambiguous language of the statute . . ., that is where [this Court's] analysis must end." *United States v. Zapatero*, 961 F.3d 123, 127 (2d Cir. 2020); *see also*, *e.g.*, *Raila v. United States*, 355 F.3d 118, 120 (2d Cir. 2004) ("Statutory construction begins with the plain text, and, where the statutory language provides a clear answer, it ends there as well."); *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.").

---

[2] *Arlen* spoke of a Section 333(b) violation; as it explained, what was once Section 333(b) was later recodified as Section 333(a)(2). 947 F.3d at 142 n.4.

11

In spite of the fact that Section 333(a)(2) does not place any limitations on who may be defrauded, Fishman and Giannelli argue that a defendant charged with a violation of Section 333(a)(2) must defraud or mislead either a consumer, the FDA, or a state drug regulator. (Fishman Br. 36–40 (consumers, FDA, and drug regulators); Giannelli Br. 14–18 (consumers and FDA)). They recognize that Section 333(a)(2) is "silent as to the object of the deception" (Giannelli Br. 13; *see also* Fishman Br. 32–34). Giannelli argues that this silence "therefore provides no guidance with respect to the contemplated victims of the deception or misleading." (Giannelli Br. 13). However, Congress has shown time and again that, where it wants to limit the reach of a fraud statute to particular "victims of the deception or misleading," it knows how to do so. *See, e.g.*, 18 U.S.C. §§ 1002 ("knowingly and with intent to defraud the United States, or any agency thereof"), 1006 ("with intent to defraud any such institution or any other company, body politic or corporate, or any individual, or to deceive any officer, auditor, examiner or agent of any such institution or of department or agency of the United States"), 1014 (criminalizing the making of false statements "for the purpose of influencing in any way the action of" specified entities), 1344(1) (criminalizing defrauding "a financial institution"), 1347(a)(1) (criminalizing defrauding "any health care benefit program"). Section 333(a)(2) contains no such limitations. *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227–28 (2008) ("Had Congress intended to limit [the relevant statute's] reach as petitioner contends, it easily could have written 'any other law enforcement officer *acting in a customs or excise*

12

*capacity*.' Instead, it used the unmodified, all-encompassing phrase 'any other law enforcement officer.' Nothing in the statutory context requires a narrowing construction . . . ." (emphasis in original); *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364–65 (2019) (rejecting effort to narrow Freedom of Information Act disclosure exemption through the creation and insertion of a "phrase that does not appear in the statute" and remarking on the D.C. Circuit's decision in another case "inappropriately resort[ing] to legislative history before consulting the statute's text and structure").

Nevertheless, Fishman and Giannelli argue that the FDCA: (1) is intended to protect consumers (Giannelli Br. 14); (2) provides for interactions with the FDA (Giannelli Br. 14–15); and (3) has been applied by courts to defendants who defrauded or misled "ultimate consumers, antecedent entities, who receive manufactured drugs within the stream of commerce, the FDA, and, in some cases, other government agencies tasked with drug regulation" (Fishman Br. 36–37). Accordingly, they argue, Section 333(a)(2) reaches only fraud on such people or entities and does not encompass state racing regulators (Fishman Br. 40; Giannelli Br. 15–18). This argument, however, has no purchase in the text of Section 333(a)(2). As both Fishman and Giannelli outline in detail, Congress was fully capable of narrowing the scope of certain provisions of the FDCA to interactions with the FDA. (Fishman Br. 35–36; Giannelli Br. 14–16). Indeed, Congress also knew how to narrow the scope of certain provisions of the FDCA to communications only with consumers. *See*, *e.g.*, 21 U.S.C. § 331(tt) (prohibiting the

13

making of "any express or implied statement or representation directed to consumers with respect to a tobacco product, in a label or labeling or through the media or advertising, that either conveys, or misleads or would mislead consumers into believing" certain falsehoods). They did not do so with respect to Section 333(a)(2). *Cf.*, *e.g.*, *United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010) (rejecting argument that 18 U.S.C. § 1589—the forced labor statute—should not be applied to a domestic relationship because the defendant argued that the "statute . . . was intended to proscribe international trafficking in slave labor and prostitution"), *Schacht v. Brown*, 711 F.2d 1343, 1355–56 (7th Cir. 1983) (rejecting the argument that civil RICO actions are limited only to situations involving "organized crime").[3]

Moreover, this Court already rejected a similar argument. In *United States v. Milstein*, an appellant asserted that Section 333(a)(2) reached only intents to defraud or mislead wholesale distributors, but not

---

[3] As the Seventh Circuit later explained in the racketeering context, but as is perfectly applicable here, "even if Congress had meant to invite the courts to limit the broad reach of [the FDCA], it provided few if any textual pegs which could permit courts to develop reasoned, consistent and principled limits without simply redrafting the statute. If, for policy reasons, it appears to be the better course to restrict the scope of [the FDCA], then Congress—not the courts—is the body to do it." *Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 747 F.2d 384, 392 (7th Cir. 1984).

14

"retail consumers and government agencies," but this Court explained that "a defendant may be convicted on evidence that government agencies were the subject of the intent to defraud," and "nothing in the language of the [applicable] statute precludes the 'intent to defraud' provision from applying to the purchasing public," and, therefore, "the District Court correctly charged the jury that it could consider Milstein's intent to defraud customers and regulatory agencies as well as his direct purchasers." 401 F.3d 53, 69–70 (2d Cir. 2005); *see also*, *e.g.*, *United States v. Ballistrea*, 101 F.3d 827, 833 (2d Cir. 1996) (noting that Section 333(a)(2) "governs violations of 21 U.S.C. § 331(a) . . . committed with an 'intent to defraud or mislead' either end users or Government agencies."). Similarly, here, "nothing in the language of [Sections 331 or 333(a)(2)] precludes the 'intent to defraud' provision from applying to" state racing regulators.

This Court was not alone. Other Circuits facing similar arguments have found, time and again, that Section 333(a)(2) encompasses the intent to defraud or mislead a broad range of entities, including state and foreign governmental authorities. *See*, *e.g.*, *Orrego-Martinez*, 575 F.3d at 6 (government agencies, including U.S. Customs authorities, may be the object of the intent to defraud or mislead under Section 333(a)(2)); *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016) (Section 333(a)(2) "is silent as to the object of the deception, but the consensus among the circuits is that [it] applies if the defendant intended to deceive either consumers or the FDA or both." (collecting cases)); *United States v. Vitek Supply Corp.*, 144 F.3d 476, 480 (7th Cir. 1998) (affirming conviction of defendant who

15

engaged in a conspiracy to distribute adulterated or misbranded animal drugs with the intent to defraud "Customs and the FDA"); *United States v. Bradshaw*, 840 F.2d 871, 874–75 (11th Cir. 1988) (rejecting defendant's effort "strictly to limit the felony penalty to situations in which the conduct defrauds or misleads the ultimate consumer," remarking that there was "no indication in the language of the statute or its legislative history that Congress meant to limit the felony penalty to conduct intended to defraud the ultimate consumer to the exclusion of the government enforcement agencies" and finding that the statute was "flexible enough to cover unforeseen situations"); *United States v. Indus. Labs. Co.*, 456 F.2d 908, 910–11 (10th Cir. 1972) (reversing for failure to instruct adequately on specific intent, but also noting that the defendants were alleged to have misled and defrauded "the consignee and the Canadian authorities" and, so, the jury should have been charged accordingly, and ordering entry of misdemeanor convictions in light of the instructional error); *United States v. Patwardhan*, 422 F. App'x 614, 616–17 (9th Cir. 2011) (finding "intent to defraud" where, among others, a doctor used the mislabeling "when billing Medicare for reimbursement").

Fishman and Giannelli argue that a series of cases —mostly from other Circuits—establish that Section 333(a)(2)'s intent to defraud or mislead must be aimed at "ultimate consumers, antecedent entities who receive manufactured drugs within the stream of commerce, the FDA, and, in some cases, other government agencies tasked with drug regulation." (Fishman Br. 36–37; Giannelli Br. 17). None of these cases, however, purported to limit who could be the victim of a

16

Section 333(a)(2) fraud; to the contrary, each rejected a defendant's limitation argument. *See Arlen*, 947 F.2d at 142 (affirming district court's holding that "the government could satisfy . . . § 333[(a)(2)] by establishing that [a defendant] had the intent to defraud or mislead a government regulatory agency," and rejecting defendant's argument that "the felony provisions of § 333[(a)(2)] are triggered only if a defendant defrauds or misleads his purchaser"); *United States v. Cambra*, 933 F.2d 752, 755 (9th Cir. 1991) (explaining, in affirming use of fraud Sentencing Guideline, that Section 333(a)(2) reaches frauds on government enforcement agencies); *Bradshaw*, 840 F.2d at 874 (rejecting defendant's argument that Section 333's felony penalty applied only "to situations in which the conduct defrauds or misleads the ultimate consumer," and affirming district court's jury instruction that the jury could convict if the defendant intended to defraud a government agency); *Indus. Labs.*, 456 F.2d at 910 (reversing for failure to instruct adequately on specific intent, but also noting that the defendant was alleged to have misled and defrauded "the consignee and the Canadian authorities" and, so, the jury should have been charged accordingly).

Fishman also argues that two cases—*United States v. Mitcheltree*, 940 F.2d 1329 (10th Cir. 1991), and *United States v. Haga*, 821 F.2d 1036 (5th Cir. 1987)—stand for the proposition that a defendant cannot violate Section 333(a)(2) if he only intends to defraud or mislead law enforcement agencies. (Fishman Br. 37–39). That misreads those cases. In *Mitcheltree*—a sufficiency-of-the-evidence case—the Tenth Circuit held that "the specific intent requirement in § 333(a)(2)

17

requires not only proof of misbranding under § 331, but also proof of an intent to mislead or defraud *which is connected to the misbranding violation under § 331.*" 940 F.2d at 1349 (emphasis in original). That is precisely the specific intent charged here. (Fishman Tr. 1310; *see also* Giannelli Tr. 1251). *Mitcheltree* went on to explain that "this *may* be proved with facts indicating knowledge of the misbranding activity and a concomitant intent to defraud or mislead the FDA or its state counterpart . . . ." *Id.* at 1350 (emphasis added). Contrary to Fishman's argument that *Mitcheltree* did not allow a Section 333(a)(2) conviction to stand where a law enforcement agency was defrauded (Fishman Br. 37–38), the Tenth Circuit simply held that there was not "sufficient proof that the defendants knowingly misbranded with the specific intent to mislead or defraud those police departments." *Id.* at 1351. Indeed, *Mitcheltree* made clear that "it is not necessarily the novelty of the government's theory, *but rather the lack of evidence to support it*, which requires reversal of the defendant's convictions on the misbranding counts." *Id.* at 1351–52 (emphasis added).[4]

_____

[4]    *Mitcheltree* states: "there must be a demonstrated link between the § 331 violation and an intent to mislead or defraud an *identifiable* drug regulatory agency involved in consumer protection." 940 F.2d at 1349 (emphasis in original). However, as made clear by the *Mitcheltree* court's emphasis on identifiability, the concern was not with who the defendant intended to defraud, but rather with whether the Government proved specific intent to defraud an identified agency. *See id.* ("Distributing drugs in knowing violation of

*Haga* is even further afield. As the *Mitcheltree* court explained, "*Haga* is a variance case," where the indictment charged a "commit any offense" conspiracy under 18 U.S.C. § 371, but the district judge found the defendant guilty of a "defraud the United States" Section 371 conspiracy after a bench trial. 940 F.2d at 1349 (citing *Haga*, 821 F.2d at 1043–45 & n.14). Moreover, the *Haga* indictment alleged that Haga acted "to defraud and mislead the FDA, the Texas State Board of Pharmacy, and the Division of Food and Drugs of the Texas Department of Health," but the prosecution proceeded under the theory "that anything but an inadvertent distribution of prescription drugs in violation of section 331 should be regarded as a section 333[(a)(2)] felony offense." *Id.* at 1043–44. The *Haga* court expressly chose *not* to decide whether a Section 333(a)(2) violation could lie where a defendant "defrauded and misled agencies rather than purchasers." *Id.* at 1044. However, *Haga* expressed concern, in *dicta*, about the Government's theory that "all conscious . . . violations would necessarily involve a deliberate evasion of established regulatory systems" and therefore felonies. *Id.* at 1344 n.17. Putting aside that the crux of *Haga* was the disconnect between two theories of violating Section 371, and that *Haga*'s concern was about watering down Section 333(a)(2)'s specific intent requirement, this Court has already expressly rejected any implication in *Haga*'s *dicta* that

_____

federal and state regulatory systems and rules is too general.").

19

government agencies could not be victims of intent to defraud. *See Milstein*, 401 F.3d at 69.

Fishman also implores this Court not to allow his conviction to stand because "[f]ederal criminal statutes involving fraud or intent to defraud should be construed to avoid expanding federal jurisdiction into matters concerning or regulated by the states." (Fishman Br. 33–34.[5] But the cases he cites have nothing to do with who can be the victim of the defendants' intent

──────────

[5] A proposed amicus brief makes the same argument. (Amicus Br. at 10–13). That proposed brief also argues that this Court should limit the scope of the FDCA's criminal provisions because "Congress created the Horse Racing Integrity and Safety Authority ('HISA'), which . . . regulates nationwide rules for racing safety, medication control, and even anti-doping." (*Id*. at 7; *see also* Fishman Br. 42 (making the same argument)). But Congress did not create HISA until 2020. *See* Horseracing Integrity and Safety Act of 2020, PUB. L. 116-260, div. FF, title XII, §§ 1201–12, 134 Stat. 3252–75 (Dec. 27, 2020) (the "HISA Act"). It is hard to see how Congress's decision to create a horseracing authority 82 years after it enacted the 1938 FDCA—indeed, after Fishman and Giannelli committed their crimes and were indicted—somehow limits the scope of the FDCA's criminal provisions. *Cf. Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 840 (1988) ("The views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").

20

to defraud or mislead, but instead concern the scope of the protected property right or criminalized scheme.[6]

Giannelli further argues that, before making a criminal referral, the Secretary of Health and Human Services must give a potential defendant "notice and an opportunity to present his views," 21 U.S.C. § 335, and, therefore, the victim of a Section 333(a)(2) violation "must be narrowly construed as the FDA." (Giannelli Br. 17). But it does not follow that, because

---

[6] Fishman also cites *United States v. Grissom*, 645 F.2d 461 (5th Cir. 1981). (Fishman Br. 33). In *Grissom*, the defendant sold soybeans in his father's name to "get even" with his landlord. *Id.* at 462–63. He later defaulted on loan payments to the Farmers Home Administration (the "FHA"), where his crops had been collateral for the loan. *Id.* Grissom was charged with violating 18 U.S.C. § 658, which prohibits disposing of property pledged to the Secretary of Agriculture "with intent to defraud." *Id.* at 463. The Fifth Circuit held that "the statute should not be read to cover the situation of a sharecropper acting solely to defraud his landlord, simply because the crops used in committing such fraud happened to be mortgaged to the FHA." *Id.* at 466. However, as Judge Vyskocil correctly explained: (1) "*Grissom* presented unique federalism issues"; and (2) in any event, "the Fifth Circuit later specifically has disclaimed reliance on its analysis (including its invocation of the Rule of Lenity) in connection with the 'intent to defraud or mislead' provision of the FDCA." (Giannelli A. 563 (citing *Bradshaw*, 840 F.2d at 875 n.7)).

21

Congress placed restrictions on an administrative agency's ability to make criminal referrals, that agency must be the only possible victim of the statutes underlying such referrals. Indeed, this is made all the clearer by the fact that the FDA must provide notice and opportunity before making a criminal referral for "violation[s] of any other Federal statute(s)." 21 C.F.R. § 7.84(c). Surely, that does not mean that no federal statute is violated unless the FDA is the victim.

Finally, Fishman asks this Court to apply the rule of lenity to "overcom[e] vagueness problems with Section 333(a)." (Fishman Br. 43). The problem with that argument is simple. As this Court has specifically held, Section 333(a)(2) is not vague; indeed, if anything, the mens rea required by Section 333(a)(2) obviates any possible vagueness concerns. *United States v. Strauss*, 999 F.2d 692, 698 (2d Cir. 1993) (holding, in the context of a vagueness challenge to 21 U.S.C. § 343(a)(1) (a food labeling statute), that "legitimate sellers of dog food will find protection in the provisions in 21 U.S.C. §§ 333(a)(2) and 343(a)(1), even in the absence of guidelines or regulations, because the terms 'intent to defraud or mislead' and 'false and misleading' are commonly used words with definite meanings."); *see also id.* ("Here, the scienter requirement need not even be inferred; it is plain from 21 U.S.C. § 333 that to be a felony, the misbranding must occur 'with the intent to defraud or mislead.' ").

In short, Section 333(a)(2) means exactly what it says—that a Section 331 violation is a felony if committed with "intent to defraud or mislead"—no more, and no less.

### B. The District Court Properly Denied the Motion to Dismiss the Indictment

Giannelli and Fishman moved to dismiss the Indictment, arguing, as relevant here, that "an agreement aimed at the distribution of misbranded and/or adulterated products with the *intent to mislead or defraud* state racehorse commissions and racetracks is not a federal crime within the scope of the felony provisions of the FDCA." (Giannelli A. 230 (emphasis in original)). Accordingly, they concluded, Counts One and Two "fail to state an offense under Section 333(a)(2) of the FDCA because race commissions and race officials are not within the ambit of that statute." (Giannelli A. 234).

The District Court denied the motion to dismiss in a lengthy, detailed, and well-reasoned opinion (Giannelli A. 528–70), finding, among other things, that: (1) the Indictment alleged that the defendants defrauded the FDA (*id.* at 543–45); (2) the Indictment alleged that another federal law enforcement agency—Customs and Border Patrol—was a victim of the deception (*id.* at 545); (3) the Indictment alleged that the FDA was effectively defrauded by efforts to defraud others (*id.* at 546–50); and (4) felony liability under the FDCA could rest on an intent to defraud or mislead state racing officials and regulators (*id.* at 550–60).

On appeal, Giannelli argues that Judge Vyskocil erred, and concludes that, "under de novo review, . . . this Court should re[vers]e the trial court on this issue and dismiss Count 2 of the indictment." (Giannelli Br. 18). Giannelli—who repeats her arguments below as to the proper victims of a Section 333(a)(2) felony

but does not discuss the indictment, the standards for dismissal of an indictment, or the District Court's opinion—is mistaken.

### 1. Applicable Law

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). "The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d. Cir. 2001). "An indictment is sufficient as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Dawkins*, 999 F.3d 767, 779 (2d Cir. 2021). To state an offense, "[a]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021). "An indictment need not be perfect, and common sense and reason are more important than technicalities." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013).

This Court "review[s] *de novo* the denial of a motion to dismiss an indictment." *United States v. Amalfi*, 47 F.4th 114, 120 (2d Cir. 2022).

24

### 2. Discussion

The District Court properly denied the motion to dismiss on the merits. (Giannelli A. 536–65). Count Two—the only count with which Giannelli was charged—"track[s] the language of the statute charged and state[s] the time and place (in approximate terms) of the alleged crime." *Wedd*, 993 F.3d at 120. In particular, among other things, it alleges that, "[f]rom at least in or about 2002 through at least in or about March 2020," Giannelli, "together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together with each other to commit offenses against the United States, to wit, violations of Title 21, United States Code, Sections 331 and 333(a)(2)," and further alleges that it was "a part and object of the conspiracy" that Giannelli would and did violate the FDCA "with the intent to defraud and mislead." (Giannelli A. 198–200). Count Two also alleges that Giannelli and her co-conspirators committed at least 13 overt acts in furtherance of that conspiracy. (*Id.* at 200–03). The Indictment also provides additional details about the background of Giannelli's conspiracy. (Giannelli A. 177–87).

Accordingly, it "contains the elements of the offense charged and fairly informs [Giannelli] of the charge against which [s]he must defend, and, second, enables [her] to plead an acquittal or conviction in bar of future prosecutions for the same offense," and is therefore sufficient. *Stringer*, 730 F.3d at 124; *see also*, *e.g.*, *Arlen*, 947 F.2d at 145 ("The prosecution [in a felony misbranding case] must prove beyond a reasonable doubt that a defendant intended to defraud or mislead

25

someone, but *the indictment need not specify the intended victim*; the focus is on defendant's intent, not the victim's identity." (emphasis added)). On appeal, Giannelli does not discuss the law or argue that the Indictment failed to state an offense.

Rather, Giannelli's entire argument is simply: "the conduct of defrauding or misleading a race commission or race official is not within the ambit of FDCA § 333(a)(2)." (Giannelli Br. 13). Beyond the fact that this is not an attack on the Indictment, but rather on the Government's theory of the case, to be resolved through appropriate jury instructions, Giannelli's argument falls flat for a number of reasons. First, Giannelli is wrong on the law: on its face, Section 333(a)(2) requires only an "intent to defraud or mislead," and does not carve out those defendants who intend to defraud or mislead state racing regulators. (*See* pages 8–21, above).

Second, even if Giannelli were correct that she could not violate Section 333(a)(2) by intending to defraud state racing regulators—and she is not—that would not help her, because, as Judge Vyskocil explained, the Indictment also explicitly alleges that the defendants conspired to defraud the FDA. (Giannelli A. 543–44; *see also id.* at 546). The Indictment also alleges that Giannelli's scheme defrauded U.S. Customs and Border Protection (Giannelli A. 179), which courts have repeatedly held to be an appropriate victim of Section 333(a)(2)'s "intent to defraud or mislead" requirement. *See Orrego-Martinez*, 575 F.3d at 6 ("evidence of defendant's intent to deceive U.S. Customs provides an adequate foundation for invoking

§ 333(a)(2)'s felony provision"); *Vitek*, 144 F.3d at 480 (affirming conviction of defendant who engaged in a conspiracy to distribute adulterated or misbranded animal drugs with the intent to defraud "Customs and the FDA").

## C. The District Court Properly Charged Fishman's Jury

Fishman[7] argues that the District Court erred by instructing the jury that a defendant could satisfy Section 333(a)(2)'s "intent to defraud or mislead" requirement if he intended to defraud or mislead state racing regulators. (Fishman Br. 31–49).[8] Not only is Fishman

---

[7] Although Giannelli joins Fishman's arguments on appeal (Giannelli Br. 26), below, she joined the Government's request that the jury be instructed that "'[i]ntent to defraud or mislead' can be demonstrated by evidence of intent to defraud or mislead consumers, state racing or drug regulators, and the Food and Drug Administration or other federal drug enforcement authorities, including the FBI and the DEA" (Dkt. 813-1 at 22). Accordingly, Giannelli has waived this argument on appeal. *See United States v. Crowley*, 318 F.3d 401, 414 (2d Cir. 2003) (defendant waives all challenges to a jury instruction where "he invited the charge").

[8] Fishman also hints at a sufficiency-of-the-evidence argument in a single parenthetical. (Fishman Br. 47 ("Moreover, the government offered limited (and, we contend, legally insufficient) evidence that Fishman intended to defraud or mislead other

27

wrong on the law—Judge Vyskocil's jury instruction was accurate—but he did not even propose an alternative jury instruction consistent with his theory on appeal, and, in any event, Fishman suffered no prejudice.

### 1. Relevant Facts

Fishman and Giannelli moved to dismiss the Indictment, arguing that Section 333(a)(2)'s "intent to defraud or mislead" could not be satisfied by intending to defraud or mislead a state racing regulator. (*See* page 22, above). In that motion, Fishman and Giannelli agreed that at least one Circuit had held that Section 333(a)(2) "may apply to a state drug enforcement agency." (Giannelli A. 256). The District Court denied the motion to dismiss. (Giannelli A. 528–70).

In the parties' joint requests to charge, Fishman proposed a charge about the "intent to defraud or mislead" element: " 'Intent to defraud or mislead' can be demonstrated by evidence of intent to defraud or mislead consumers, state racing and drug regulators, and the Food and Drug Administration, US Customs and Border Protection or other federal drug enforcement authorities." (Fishman A. 182). However, Fishman

───────────────

government entities.")). However, "merely mentioning or simply stating an issue in an appellate brief is insufficient to preserve it for [this Court's] review: an appellant must advance an argument, and we generally will decline to consider issues that are not sufficiently argued." *Niagra Mohawk Power Corp. v. Hudson River-Black River Reg. Dist.*, 673 F.3d 84, 107 (2d Cir. 2012).

28

also "respectfully renew[ed his] objections to this
charge as outlined in [his] pretrial dismissal mo-
tion[ ]." (Dkt. 649-1 at 26).[9] Fishman also asked the
District Court to instruct the jury that:

> The FDCA does not purport to regulate
> the competitive integrity of horse races.
> And Dr. Fishman is not charged with vi-
> olating, or conspiring to violate, state or
> local racing rules. If you find that Dr.
> Fishman intended only to conceal from
> authorities, for purposes of competitive
> advantage, the presence of performance
> enhancing drugs in racehorses, you must
> acquit him of the felonies charged in the
> indictment.

(Fishman A. 187). Judge Vyskocil instructed the jury
substantially similarly to Fishman's proposed "intent
to defraud and mislead" language from the joint re-
quests to charge (Fishman Tr. 1311), but declined to
issue his supplemental instruction (Fishman
Tr. 1078).

## 2. Applicable Law

This Court reviews a defendant's preserved "claim
of error in jury instructions *de novo*, reversing only
where, viewing the charge as a whole, there was a

---

[9] This page of the joint requests to charge is re-
published at Fishman A. 182; however, the objection is
contained in a virtual "sticky note" that can be ac-
cessed on the District Court's electronic docket.

29

prejudicial error." *United States v. Fofanah*, 765 F.3d 141, 145 (2d Cir. 2014). An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 82 (2d Cir. 2018).

In reviewing instructions, this Court looks not only to the particular words or phrases questioned by the defendant, but also to "the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Bala*, 236 F.3d 87, 94–95 (2d Cir. 2000). Viewing the instructions as a whole is critical because "[o]ften isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990). "Even if an instruction was erroneous," this Court "will not reverse a conviction unless (1) the instruction was prejudicial to the defendant, and (2) the defendant requested an alternative charge that accurately represented the law in every respect." *Kirk Tang Yuk*, 885 F.3d at 70–71. The prejudice requirement precludes a defendant from obtaining relief where it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999).

"A party who objects to any portion of the [jury] instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." FED. R. CRIM. P. 30(d). To satisfy that

requirement, a defendant must "direct the trial court's attention to the contention that is to be raised on appeal." *United States v. Masotto*, 73 F.3d 1233, 1237 (2d Cir. 1996). "The purpose of this provision is to provide the trial court with an opportunity to correct any error in the jury instructions before the jury begins deliberating." *Id.*

Where a defendant failed to make a specific and timely objection to a district court's legal instruction, that instruction is reviewable only for plain error. *United States v. Middlemiss*, 217 F.3d 112, 121 (2d Cir. 2000); FED. R. CRIM. P. 30(d). Plain error is a stringent standard, requiring an appellant to demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). To have affected a defendant's substantial rights, there must have been "a reasonable probability that the error affected the outcome of the trial." *Id.* at 262. Consistent with these principles, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *United States v. Weintraub*, 273 F.3d 139, 145 (2d Cir. 2001). Moreover, this Court "typically will not find such [plain] error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." *United States v. Hunt*, 82 F.4th 129, 139 (2d Cir. 2023).

### 3. Discussion

The District Court "delivered a correct interpretation of the law," *Bala*, 236 F.3d at 94–95, when it instructed the jury about Section 333(a)(2)'s "intent to defraud or mislead" element (Fishman Tr. 1310–11), including that "[i]ntent to defraud or mislead can be demonstrated by evidence of intent to defraud or mislead consumers, state racing and drug regulators, the Food and Drug Administration, or other federal drug enforcement authorities, including U.S. Customs and Border Protection, the FBI and the DEA" (Fishman Tr. 1311). Fishman's arguments otherwise fail for at least four reasons. First, and most simply, Fishman is wrong on the law: Section 333(a)(2) does not implicitly carve state racing regulators out from the scope of its possible victims. (*See* pages 8–21, above).

Second, Fishman never proffered an alternative jury instruction below; instead, he simply "renew[ed his] objections to this charge as outlined in [his] pretrial dismissal motion[]." (Dkt. 649-1 at 26).[10]

---

[10]  This is not merely academic. Absent a specific requested instruction—and particularly in light of the numerous theories Fishman offered in his motion to dismiss—this Court cannot know if Fishman wanted the District Court to instruct the jury, among others, that: (1) "race commissions and race officials are not within the ambit of" Section 333(a)(2) (Giannelli A. 234, 251); (2) any intent to defraud or mislead had to be connected to the "protect[ion of] consumers or purchasers" (*id.* 238, 251–52); (3) "prohibited acts [must] relate either to conduct directed at or likely to

Accordingly, Fishman's objection is forfeited and reviewed for plain error. *United States v. Alli-Balogun*, 72 F.3d 9, 12 (2d Cir. 1995) ("Because defense counsel in the instant case did not request such an instruction, defendant must prove that the district court committed plain error . . . ."). Given that there is "no binding precedent from the Supreme Court or this Court" on the "operative legal question" here, this Court cannot find such plain error. *Hunt*, 82 F.4th at 139.

---

harm consumers or conduct or acts directed at the FDA" (*id.* 239–40, 253–54); (4) the "FDA [must be] the agency defrauded or misled by such violations" (*id.* 242); (5) the "ultimate consumer or end user of article or drug [must have been] misled or defrauded" (*id.* 252); (6) the "aim [could be] to mislead or defraud Canadian government and Canadian firm [consignee] aout their adherence to new drug testing standards" (*id.* at 252); or (7) Section 333(a)(2) "may extend to state drug enforcement authorities" (*id.* 256–57). Or, perhaps, he wanted the District Court to instruct the jurors simply to acquit on the felony provisions of Counts One and Two. (*Id.* 237 ("Congress never intended the felony FDCA provisions to apply to the conduct alleged in Counts 1 and 2.")). This illustrates why, to preserve his objection for appeal, Fishman was required to "request[ ] an alternative charge that accurately represented the law in every respect," which charge this Court could evaluate in contrast with the District Court's actual instruction. *Kirk Tang Yuk*, 885 F.3d at 70–71.

33

Indeed, the alternative instruction that Fishman did request—"If you find that Dr. Fishman intended only to conceal from authorities, for purposes of competitive advantage, the presence of performance enhancing drugs in racehorses, you must acquit him of the felonies charged in the indictment" (Fishman A. 187)—addressed the underlying motivation for a defendant's decision to defraud or mislead, as opposed to the object of such a fraud. Not only did this proposed instruction not address the potential victims of Fishman's fraudulent conspiracy, but Fishman offers this Court no law in support of the charge.[11] *See United States v. Beeech-Nut Nutrition Corp.*, 871 F.2d 1181, 1192 (2d Cir. 1989) ("the court's refusal to give that charge was not error, for the requested instruction does not accurately reflect the law.").

Third, even if Fishman had preserved his objection, and if Fishman were right on the law, there would be no error, as state racing regulators are responsible for, among other things, drug regulation. Fishman agrees

───────────

[11] In a heading, Fishman argues that the District Court "erred . . . by denying a defense request to instruct the jury that Fishman could not be convicted of the felony solely based on an intent to gain competitive advantage in horse racing." (Fishman Br. 31). However, he never develops this theory, other than in the context of arguing that Section 333(a)(2) does not apply to state racing regulators. (Fishman Br. 41–42). This is not enough to preserve whatever argument Fishman may want to make about the intentions behind his fraud. *See Niagra Mohawk*, 673 F.3d at 107.

34

that "courts have found that the requisite 'intent to de-
fraud or mislead' can be directed at defrauding . . .
other government agencies tasked with drug regula-
tion." (Fishman Br. 36–37). He argues, though, that
state racing regulators "are not drug regulators."
(Fishman Br. 40). He is mistaken. Indeed, the jury
heard that the Division of Pari-Mutuel Wagering in
the State of Florida "oversee[s] all of the drug testing
that is done on the racehorses in the state" and em-
ploys a forensic drug testing program that analyzes bi-
ological samples "for non-permitted medications and
for the presence of overages of permitted medications."
(Fishman Tr. 598, 610). Racing regulators in different
states "set standards for the use of substances within
a certain . . . timeframe of race." (Fishman Tr. 630).

Not surprisingly, therefore, state racing regulators
set forth, or otherwise adopt, detailed regulations re-
garding permissible and impermissible drugs, includ-
ing with reference to drugs that are unapproved by the
FDA. (Fishman Tr. 633 ("The FDA—currently the
Racing Commissioners International classification
system recommends that no drug be present in the
horse that is not approved by the FDA . . . but there is
some variation in state-to-state interpretation."), 642
("Non-FDA-approved products are not allowed to be
administered to racehorses.")).[12] And the state racing

_____

[12]   *See also* 9 NYCRR § 4012.1 (limiting the class of
individuals in New York who may possess on licensed
facilities "any controlled substance, listed in schedules
I through IV of section 812 of title 21 of the United
States Code (Food and Drugs) or any drug that has not
been approved for use in the horse by the Federal Food

35

commissions who Fishman conspired to defraud expressly describe the mission of their racing commissions as protecting health and safety, including those of the racing animal, *see* 9 NYCRR § 4002.9; FLA. STAT. § 550.2415; FLA. ADMIN. CODE § 61D-6.001; N.J. ADMIN. CODE § 13:70-14A.1; 3 DEL. ADMIN CODE § 501-8.1, which health and safety is necessarily intertwined with those regulators' drug-control functions.

Racing commissions therefore "set[ ] drug standards, inspect[ ] drugs, [and] regulate[ ] the use of prescription drugs." *Mitcheltree*, 940 F.2d at 1352. By that measure, state horseracing regulators are more squarely devoted to consumer protection and drug regulation than U.S. customs officials, who are appropriate victims of a Section 333(a)(2) fraud. *See Orrego-*

---

and Drug Administration" and requiring detection of such activities, and mandatory reporting of certain positive drug tests); 9 NYCRR §§ 4042.5, 4043.2, 4043.12, 4043.16 (setting forth permissible uses of drugs and prohibiting the use of drugs in contravention to the enumerated provisions); FLA. ADMIN. CODE §§ 61D-6.008 (setting forth prescription requirements), 61D-6.011 (setting forth drug classifications and penalties for violations), 61D-6.003 (setting forth drug storage requirements); N.J. ADMIN. CODE § 13:70-27.2 (setting forth mandate regarding appropriate drug labeling); 3 DEL. ADMIN. CODE. §§ 1001.15.1.1 (setting forth prohibitions on use of certain drugs), 1001.15.12.1, 501-8.7.1.2 (prohibiting the use of unapproved drugs under the FDA in both thoroughbred and harness racing).

*Martinez*, 575 F.3d at 6; *Vitek*, 144 F.3d at 480. Fishman, who agrees that "the FDA or, for that matter, state drug enforcement agencies" are proper victims of a Section 333(a)(2) fraud, argues that state racing regulators do not have certain duties—such as "inspecting drug manufacturers, distributors, wholesalers, or pharmacies"—that the FDA has, and, therefore, that they do not count. (Fishman Br. 41). But there is no law requiring courts to slice the salami that thin: it is tough enough to tell this Court that, despite the lack of any limitation in the statute, Section 333(a)(2)'s "intent to defraud or mislead" element must be directed at consumers or drug regulators; it is another thing entirely to assert now that such intent must be directed only at drug regulators of Fishman's choosing.

Fourth, even if Fishman could demonstrate error—which he cannot—any error would be harmless, and Fishman would suffer no prejudice, because of the substantial evidence that Fishman intended to defraud the FDA, U.S. Customs, and state drug agencies other than state racing regulators. Indeed, Fishman was caught on a wiretap explaining that he was worried about the FDA finding out what he was doing. (GX 140D-T; Fishman Tr. 594). These concerns help explain why Fishman set up a Panamanian corporation to distribute his misbranded drugs, which he explained on a recording he made of himself, was because he "didn't want an FDA issue," so he "set it up as a shield against the FDA," who would not inquire further when they "say oh it's a Panamanian corporation.". (GX 912-A; Fishman Tr. 596).

37

Fishman did not limit his concerns to the FDA: he recorded himself explaining that he insisted on non-disclosure agreements in order to protect himself from a variety of regulatory bodies: "If some kinda regulatory body comes to her. The beautiful thing is that she shows that piece of paper [an NDA] and she can't talk to that regulatory unless I'm there." (GX 910-T; Fishman Tr. 596). And Fishman was specific: he was concerned about how customs officials might discover what he was doing. On a wiretapped call, one of Fishman's customers asked about misbranded drugs: "You know you can't ship that to Canada, correct?"; Fishman responded "I doubt it. It's like you never uh can uh anticipate, you know, what's going to go on. Sometimes no problem. But I never like to say yes because every time I say yes to somebody, it doesn't happen." (GX 113A-T; Fishman Tr. 498–99). So Fishman lied on customs forms to avoid detection. (GX 402H, 709; Fishman Tr. 101–09, 523–25). Similarly, Fishman and his co-conspirators sought to deceive the Delaware Division of Professional Regulation, a state drug regulatory agency. (GX 3000, 3001; Fishman Tr. 932–38).

In short, even if Judge Vyskocil had instructed the jury that it had to find that Fishman conspired to intend to defraud or mislead the FDA, U.S. Customs officials, or state drug regulatory agencies, the evidence demonstrated "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013).

38

**POINT II**

**The District Court Did Not Plainly Err When It Admitted Evidence of Giannelli's Awareness of, and Lies to Authorities in Connection With, a Delaware Investigation into Her and Fishman's Drug-Distribution Scheme**

In 2011, the Delaware Division of Professional Regulation investigated Fishman and Giannelli regarding the death of a racehorse who died after being injected with Fishman's drugs; the Indictment alleged, as an overt act for Count Two, that Fishman and Giannelli lied during that investigation (although the Indictment did not allege that a horse died). Giannelli moved to preclude evidence of the investigation, arguing only that "the relevance of this evidence will be substantially outweighed by the danger of unfair prejudice resulting from the death of the equine . . . ." (Giannelli A. 578–79 (citing FED. R. EVID. 403)). The District Court allowed the Government to introduce evidence about the investigation but, in response to Giannelli's motion, precluded evidence that the horse died. (Giannelli A. 734–35). On appeal, Giannelli argues, for the first time, that, pursuant to Federal Rule of Evidence 404(b), Judge Vyskocil erred by allowing in evidence of the Delaware investigation, and that the Government improperly used that evidence to impeach Giannelli. (Giannelli Br. 18–26). Giannelli is wrong: the District Court did not plainly err by admitting evidence of conduct that was part of the charged conspiracy, or by failing, *sua sponte*, to strike wholly proper remarks by the Government during its summation.

## A. Relevant Facts

In January 2011, a veterinarian filed a complaint with the Delaware Division of Professional Regulation about Fishman's and Giannelli's[13] potential violations of law dispensing drugs to racehorses, which resulted in the death of a racehorse. (GX 3001; Dkt. 572 at 31). Delaware investigated Fishman and Giannelli; Fishman and Giannelli tried to evade responsibility and Giannelli falsely denied being involved as anything other than a "delivery person" like "a UPS driver." (Giannelli Tr. 1085). Delaware eventually dismissed the matter based on insufficient evidence. (Giannelli Tr. 402—03).

Before trial, the Government moved to admit evidence of the investigation as non-hearsay (Dkt. 572 at 31–34), and Giannelli moved to preclude that evidence under Federal Rule of Evidence 403 (Giannelli A. 576–79).[14] While Giannelli sought to preclude admission of all evidence of the investigation, she argued only that

---

[13] The Delaware paperwork referred to Lisa Giannelli as "Lisa Ranger," and Giannelli testified as "Lisa Voshell"; they are all the same person, with different married names. (Giannelli Tr. 884).

[14] Not only did Giannelli *not* move to preclude the records under Rule 404(b), but her motion specifically moved to preclude "three categories" of "other crimes" evidence under Rule 404(b); she did not include the Delaware investigation as one of those categories. (Giannelli A. 579–82).

40

evidence of the death of the horse would constitute un-
fair prejudice:

> . . . the relevance of this evidence will be
> substantially outweighed by the danger
> of unfair prejudice *resulting from the*
> *death of the equine* due, in all likelihood,
> to causes other than any product distrib-
> uted by Dr. Fishman. The admission of
> evidence regarding the alleged distribu-
> tion of Pentosan Gold to this racehorse
> *will prompt a mini-trial on the cause of*
> *death of this racehorse*; and the culpabil-
> ity of these defendants which will confuse
> the jury and distract them from the is-
> sues in this case.

(Giannelli A. 578–79 (emphasis added)). Accordingly,
she asked that, if the District Court were to admit the
evidence, it be redacted to eliminate references to the
death of the racehorse. (Giannelli A. 643).

The District Court found "that the fact that there
was an investigation and some of the statements in the
complaint are relevant to the argument relating to the
defendants being on notice with respect to the legality
of what they were doing and do bear on their state of
mind and perhaps the issue of intent to defraud or mis-
lead," but also that "evidence of the death of the race-
horse would be more prejudicial than probative."
(Giannelli A. 734–35). Accordingly, Judge Vyskocil did
as she was asked: she "preclude[ed] as prejudicial un-
der Rule 4[0]3, more prejudicial than probative any
mention of the fact that the horse died." (Giannelli

41

A. 734–35; *see also* Dkt. 692 at 39 (confirming that "the death of the horse in Delaware [is] off limits.")).

At trial, the parties stipulated to various facts and admitted certain documents about the Delaware investigation. (Giannelli Tr. 401–03; GX 3000, 3001, 9013). Among other things, the parties agreed that "the Delaware State Attorney General's Office dismissed the matter in Government Exhibit 3000 based on insufficient evidence." (Giannelli Tr. 403). Giannelli admitted on the stand that, although she had told Delaware authorities that she was nothing more than a "delivery person" like a "UPS driver," in fact, unlike a UPS driver, she incorporated Equestology, opened an account for Equestology with Fishman, worked on commission based on the clients' payments, and was, "I guess," a "salesperson." (Giannelli Tr. 1085–88).

During its summation, the Government explained that, in this fraud conspiracy, there was evidence that Giannelli "was deceiving people" because, as part of that conspiracy, she "outright lied." (Giannelli Tr. 1181). As part of this discussion, the Government contrasted Giannelli's false statements to Delaware investigators with the facts elicited at trial. (Giannelli Tr. 1181–83). Giannelli did not object.

## B.  Standard of Review

It is well-established that evidence of "other crimes, wrongs or acts" is admissible under Federal Rules of Evidence 404(b) and 403 if such evidence is relevant to some issue at trial other than the defendant's propensity to commit the crime charged, and if the probative value is not substantially outweighed by the risk of

unfair prejudice. *See, e.g.*, *Huddleston v. United States*, 485 U.S. 681, 685–86 (1988); *accord United States v. Graham*, 51 F.4th 67, 81 (2d Cir. 2022). Specifically, evidence of other crimes or bad acts is admissible for the purposes of showing "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). This Court has repeatedly endorsed an "inclusionary approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *Graham*, 51 F.4th at 81–82. To determine whether a district court properly admitted other act evidence, the Court considers "whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. McPartland*, 81 F.4th 101, 115 (2d Cir. 2023).

Not all evidence of uncharged criminal activity is subject to analysis under Rule 404(b), however. It is well established, for example, that "other acts" evidence is admissible as direct evidence of the crimes charged if it (1) "arose out of the same transaction or series of transactions as the charged offense"; (2) was "inextricably intertwined with the evidence regarding the charged offense"; or (3) is "necessary to complete the story of the crime on trial." *Graham*, 51 F.4th at 82. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the

43

charges can have that tendency." *United States v. Williams*, 585 F.3d 703, 707 (2d Cir. 2009).

Although relevant, evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Under Rule 403, so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk of prejudice, its conclusion will be disturbed only if it is "arbitrary or irrational." *United States v. Napout*, 963 F.3d 163, 185 (2d Cir. 2020).

This Court typically reviews evidentiary rulings, including rulings about Rule 404(b) evidence, for abuse of discretion. *McPartland*, 81 F.4th at 114. However, where a defendant fails to object to the admission of evidence at trial, this Court reviews for plain error. *United States v. Felder*, 993 F.3d 57, 77 (2d Cir. 2021); FED. R. CRIM. P. 52(b). As a corollary, where a defendant objects to the admission of evidence on one theory, but raises another theory on appeal, this Court reviews the unpreserved theory for plain error. *United States v. Agrawal*, 726 F.3d 235, 249–50 (2d Cir. 2013).

## C. Discussion

Judge Vyskocil appropriately exercised her broad discretion when she admitted evidence of the Delaware investigation into Giannelli and Fishman's scheme. Apparently recognizing that the facts of the investigation constituted direct evidence of the charged conspiracy, Giannelli did not object below

44

under Rule 404(b); rather, she argued that she would suffer undue prejudice if the jury heard about the death of a racehorse. The District Court agreed. Now, for the first time on appeal, Giannelli argues that the District Court improperly admitted evidence of the Delaware investigation as Rule 404(b) "other act" evidence. (Giannelli Br. 18–26).

Giannelli did not object to the admission of evidence of the Delaware investigation below on the basis of Rule 404(b); accordingly, this Court reviews the District Court's decision only for plain error. *Felder*, 993 F.3d at 77; *Agrawal*, 726 F.3d at 249–50. However, Judge Vyskocil did not err at all, much less plainly err.

First, and most importantly, evidence of the Delaware investigation was not "other acts" evidence; rather, it was direct evidence of the charged conspiracy. After all, the Delaware investigation involved evidence of false statements Giannelli and Fishman made as co-conspirators to conceal their illegal scheme to dispense drugs to racehorses, and that was specifically alleged in the Indictment as an overt act in furtherance of the conspiracy charged in Count Two:

> In or about 2011, GIANNELLI and SETH FISHMAN, in an attempt to avoid the imposition of penalties in connection with an investigation of FISHMAN and GIANNELLI's sales of misbranded and adulterated drugs by the State of Delaware, Division of Professional Regulation, each falsely claimed, among other things, that GIANNELLI "does not sell drugs for Dr. Fishman."

45

(Giannelli A. 201). This, alone, ends the analysis. After all, it is self-evident that "[a]n act done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). Accordingly, where conduct or incidents are "charged as overt acts in the indictment[,] evidence of [that conduct is] not subject to the strictures of Rule 404(b)." *United States v. James*, 520 F. App'x 41, 45 (2d Cir. 2013); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that acts in furtherance of a conspiracy are not subject to Rule 404(b), even if they are *not* charged in the indictment).

Giannelli is simply mistaken that the Government admitted the evidence of the Delaware investigation to "impeach" Giannelli. The Government offered that evidence in its direct case, pursuant to a stipulation, well before Giannelli even testified, as direct evidence of the charged conspiracy. (Giannelli Tr. 401–03; GX 3000, 3001, 9013). And the Government appropriately argued that, in a case about Giannelli agreeing to lie to authorities about her scheme with Fishman and about selling unapproved drugs, the jury could look to evidence that Giannelli, in fact, lied to Delaware authorities investigating her and Fishman's sales of unapproved drugs. (Giannelli Tr. 1181–83). Giannelli complains that "there was never a finding that [she] lied during the Investigation." (Giannelli Br. 23). But the jury was explicitly told that "the Delaware State Attorney General's Office dismissed the matter . . . based on insufficient evidence" (Giannelli Tr. 403), and the Government told the jury that its

46

argument that Giannelli lied was based on the evidence at trial, and not a finding by Delaware authorities (Giannelli Tr. 1182 ("The defendant was not telling the truth. The record that's been presented at this trial makes that clear.")).

Second, although Giannelli accuses the Government of making "character and propensity arguments . . . during summations" (Giannelli Br. 23), she fails to point to any such arguments; rather, she simply block-quotes the Government explaining that Giannelli lied during the Delaware investigation, thus proving that she "was deceiving people" as part of the conspiracy. (Giannelli Br. 21–22). Giannelli failed to raise a contemporaneous objection and cannot show these statements were plain error or that she was prejudiced—indeed, the "failure to object or request a curative instruction indicates that any prejudice was minimal." *United States v. Daniel*, 570 F. App'x 14, 17 (2d Cir. 2014).

Third, in any event, evidence of the Delaware investigation—and Giannelli's decision to lie to authorities during that investigation—would have been properly admitted under Rule 404(b), and the probative value of the evidence outweighed any potential for unfair prejudice. This evidence was highly probative of Giannelli's knowledge of the fraudulent nature of her and her co-conspirators' actions, as well as her intent in misleading various authorities, including Delaware authorities. *See*, *e.g.*, *United States v. Bayfield*, 796 F. App'x 19, 21–22 (2d Cir. 2019) (holding that evidence of the submission of a false deed was probative of defendant's knowledge and intent). Moreover, the only

potential prejudice of which Giannelli complained—the fact that a horse had died (Giannelli A. 578–79, 643)—had already been ameliorated, as Judge Vyskocil precluded evidence of that fact (Giannelli A. 734–35; Dkt. 692 at 39), and no such evidence was ever placed before the jury.

## POINT III

### Fishman's Sentence Was Procedurally Reasonable

Fishman argues that his years-long crimes caused no losses and, as a result, the District Court erred when it used Fishman's gains as an alternative to his victims' losses in calculating Fishman's applicable Sentencing Guidelines and that, in any event, it used the wrong numbers when it calculated that gain as between $9.5 and $25 million. (Fishman Br. 55–61). Fishman is mistaken: as Judge Vyskocil explained, among other losses, "in light of the nature of this conspiracy and the evidence . . ., the loss of purse money by the racing competitors of Dr. Fishman's coconspirators was . . . a reasonably foreseeable pecuniary harm." (Fishman A. 292). And Fishman's counsel specifically "accept[ed] that figure [between $9.5 million and $25 million] for purposes of calculating loss," given the District Court's ruling that there were actual losses. (Fishman A. 295–96).

### A.   Relevant Facts

In advance of sentencing, the Probation Office prepared a Presentence Report that calculated Fishman's offense level under the Guidelines to be 39: a base

48

offense level of 6, pursuant to U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(2); an increase of 20 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(K) & comment. (n.3(B)), "because the offense resulted in losses that cannot be reasonably determined and because the gain that resulted from the offense is greater than $9,500,000 but less than $25,000,000"[15]; an increase of two levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims;[16] an increase of two levels, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means; an increase of two levels, pursuant to U.S.S.G. § 3B1.3, because Fishman abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense; an increase of four levels, pursuant to U.S.S.G. § 3B1.1(a), because Fishman was an organizer or leader of a criminal activity that involved five or more participants; and an increase of three levels, pursuant to U.S.S.G. § 3C1.3, because the statutory sentencing enhancement under 18 U.S.C. § 3147 applied. (Fishman PSR ¶¶ 106–20). The Presentence Report also identified a number of victims, including "the racetracks that had doped horses run at their tracks, . . . pa[id] the winner, and therefore[ ] lost money directly," and "[c]ompetitors [who] miss[ed] out on wins that

---

[15] That amount "represented the amount of money won by Fishman's most prominent client." (PSR ¶ 94).

[16] The parties and the District Court ultimately agreed that the Section 2B1.1(b)(2)(A)(i) enhancement did not apply. (Fishman A. 297).

49

rightfully could have been theirs." (Fishman PSR ¶¶ 15, 99–102).

Fishman objected to the 20-level increase "based on a purported gain of over $13 million, apparently representing gross revenues from illegal drug sales allegedly attributable to Equestology." (Dkt. 888 at 11). He did not dispute the amount; rather, Fishman argued that "resort to gain is off-limits unless the government first proves the existence of an actual loss that reasonably cannot be determined," and, "because doping does not guarantee victory, the government cannot begin to prove that racetracks, competitors or the betting public suffered actual loss or pecuniary harm directly and proximately resulting from the offense." (*Id.* at 11–12). Thus, Fishman concluded, "[w]ithout a showing of actual loss, resort to gain as a proxy is impermissible." (*Id.* at 12).

At Fishman's sentencing, the District Court rejected Fishman's argument as a matter of fact, finding by a preponderance of the evidence that: (1) "[t]here was evidence at trial about the cost and expense to have drugs approved, to have facilities licenses, and about the desire to avoid those costs"; (2) "there was pecuniary harm to regulators [because] they didn't collect the fees in connection with the licensing of the facilities in which Dr. Fishman operated or the approval of the various drugs that he was selling"; (3) "Fishman caused actual loss to racing competitors of his coconspirators, including specifically Jorge Navarro," and "the loss of purse money by the racing competitors of Dr. Fishman's coconspirators was … a reasonably foreseeable harm"; and (4) "the defendant concedes, in

50

substance, that the betting public, racetracks, and competitors were all victims, in addition to drug regulators and racing regulators. Certainly those participants in the racing industry suffered actual loss." (Fishman A. 291–92). Judge Vyskocil noted that she "could use the actual loss to the competitors of Dr. Fishman's coconspirator, Jorge Navarro," which were "in excess of $25 million," which would result in a 22-level increase in Fishman's offense level, but, "since the guideline calculation is supposed to reflect all of the conduct," and she could not reasonably measure that actual loss, she would instead use Fishman's "gain in excess of $13 million to yield a 20-point enhancement." (Fishman A. 293–94). Although Fishman maintained his objection to the District Court's finding of "actual loss" (Fishman A. 294), he explicitly stated that, "[g]iven [the District Court's] ruling, [he] accept[ed] that figure [between $9.5 million and $25 million] for purposes of calculating loss." (Fishman A. 295–96).[17]

## B.  Applicable Law

"[A]ppellate courts play an important but clearly secondary role in the process of determining an

––––––––––––

[17]  After the District Court raised the issue of forfeiture, Fishman told the Court that he "has an issue with credits by virtue of items seized against what the amount would be." (Fishman A. 296). The District Court confirmed that that issue was with forfeiture— as opposed to the Guidelines calculation—and Fishman did not disagree. (Fishman A. 296).

51

appropriate sentence" and "review the work of district courts under a 'deferential abuse-of-discretion standard." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Under this standard, this Court must determine whether a District Court's sentencing decision is procedurally sound. *Id.* at 189–90. "A district court commits procedural error where it fails to calculate the Guidelines range . . ., makes a mistake in its Guidelines calculation, or treats the Guidelines as mandatory." *Id.* at 190. In reviewing a sentencing court's procedure, this Court applies "a strong presumption that the sentencing judge has considered all arguments properly presented to her, unless the record clearly suggests otherwise." *United States v. Robinson*, 799 F.3d 196, 202 (2d Cir. 2015).

Section 2B1.1 of the Guidelines provides for enhancements of the offense level based on the amount of loss resulting from the offense conduct. U.S.S.G. § 2B1.1(b). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Moseley*, 980 F.3d 9, 29 (2d Cir. 2020). The sentencing court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, comment. (n.3(C)).

Where "there is a loss but it reasonably cannot be determined," the Guidelines provide that the District Court "shall use the gain that resulted from the offense as an alternative measure of loss." U.S.S.G. § 2B1.1, comment. (n.3(B)).

With respect to disputes over facts underlying sentencing, this Court will "not overturn the district court's findings of fact unless they are clearly

erroneous." *United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015). "[W]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Hernandez v. New York*, 500 U.S. 352, 369 (1991). Similarly, because a sentencing judge "is in a unique position to assess the evidence and estimate the loss based upon that evidence," her findings are "entitled to appropriate deference" on appeal. U.S.S.G. § 2B1.1, comment. (n.3(C)).

## C. Discussion

Fishman argued below that, "because doping does not guarantee victory, the government cannot begin to prove that racetracks, competitors or the betting public suffered actual loss or pecuniary harm directly and proximately resulting from the offense." (Dkt. 888 at 12). Similarly, on appeal, Fishman argues that his co-conspirators' competitors "did not suffer an actual pecuniary loss because of the offense" because their "failure to win cannot be reasonably ascribed to Navarro's use of PEDs provided by Fishman or a co-conspirator and the government did not even attempt to show the runners up were not also using PEDs." (Fishman Br. 56–57). But after Navarro—Fishman's co-conspirator—won a $1.5 million purse with a doped racehorse—XY Jet—Fishman texted Navarro "Congratulations just saw your race," and Navarro responded "Thank u boss u are a big part of it." (GX 401-K; Fishman Tr. 693–94; Fishman PSR ¶ 79). As another example, Adrienne Hall and Fishman spoke about a doped racehorse who Hall explained "dominated" and "won by five lengths. I mean he was a completely different animal." (GX 105B-T; Fishman Tr. 801–23).

Judge Vyskocil did not clearly err when she chose to believe that the evidence—including Navarro's and Hall's conversations with Fishman—demonstrated that "[t]here is simply no colorable argument, in light of the nature of this conspiracy and the evidence that I've just described, that the loss of purse money by the racing competitors of Dr. Fishman's coconspirators was not a reasonably foreseeable pecuniary harm." (Fishman A. 292).

The District Court, moreover, did not abuse its discretion in holding that losses sustained by racetracks or competitors of Fishman's co-conspirators were actual losses caused by the offenses of conviction. Fishman argues otherwise—without citing a case—claiming that "the racetracks did not lose any money and were not the victims of the offense. The offense of conspiracy to commit the misbranding and adulteration of animal drugs made consumers or possibly the FDA its victims, not racetracks." (Fishman Br. 56). That, however, is not the standard by which losses are determined. The losses to racetracks and competitors of Fishman's co-conspirators were "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(i)). This is similar to *United States v. Lacey*, in which the defendants were charged with participating in a fraudulent mortgage scheme, during which they used straw buyers. 699 F.3d 710, 712–13 (2d Cir. 2012). Although "the main thrust of the fraud was directed at banks," this Court held that, "[i]f a mortgage scheme predictably results in pecuniary harm to unwitting, deceived straw buyers, the straw buyers have sustained 'actual loss' and are therefore 'victims' within the meaning of the

54

guidelines." *Id.* at 715; *see also*, *id.* (explaining that a straw buyer's need to hire an attorney to deal with the legal consequences of foreclosure counted as "harm" under the Guidelines); *cf. United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) ("Intended loss is tantamount to the probable loss from a particular misstatement because one is presumed to intend the natural and probable consequences of one's acts.").

Fishman also argues, for the first time on appeal, that the gain from his offense was not a "reasonable estimate of the actual or intended loss." (Fishman Br. 59). Fishman did not make that argument below; to the contrary, he stated that his objections were: (1) "absence of actual loss" and (2) "absence of actual loss proximately caused by Dr. Fishman's offense conduct." (Fishman A. 294). When it came to the applicability of a "gain that resulted from the offense [that] is greater than $9.5 million and less than $25 million" (PSR ¶ 109; Fishman A. 295), Fishman affirmatively "accept[ed] that figure for the purposes of calculating loss," given the Court's ruling that there were actual losses (Fishman A. 295–96). This constitutes actual waiver, and Fishman cannot now argue otherwise on appeal. *See United States v. Jass*, 569 F.3d 47, 66 (2d Cir. 2009) ("When a defendant fails to challenge factual matters contained in the presentence report at the time of sentencing, the defendant waives the right to contest them on appeal."); *United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008) (deeming challenge to Guidelines enhancement waived because defendant "failed to object when the enhancement was recommended in the PSR"). If reviewed at all, this unpreserved claim would be reviewed only for plain error.

55

*United States v. Verkhoglyad*, 516 F.3d 122, 127–28 (2d Cir. 2008). The District Court did not err at all, much less plainly err, by failing to determine whether Fishman's gain reasonably approximated his loss given that it found that the losses of Navarro's competitors, alone, exceeded $25 million, or nearly twice the gain attributed to Fishman. (Fishman A. 293).

Fishman also contests the methodology by which the District Court arrived at its "gain" figure. (Fishman Br. 60–61). He argues that, "[w]here the amount of the defendant's gain is contested, as it was here, the district court is required to have provided a more thorough explication of its calculation, explicitly referencing the evidence upon which it relied." (Fishman Br. 61). Except that the District Court explained that it derived the gain figure from the Presentence Report, to which Fishman did not object, and "the amount of [Fishman's] gain" was *not* contested; rather, Fishman affirmatively accepted it. (Fishman A. 295–96).

## POINT IV

### The District Court Did Not Abuse Its Discretion in Imposing Restitution

Fishman was convicted of participating in two conspiracies: one with Navarro (Count One), and one with a number of other trainers (Count Two). With respect to the Count One conspiracy, Navarro had agreed to pay $25,860,514 in restitution to various racetracks, constituting the purses paid to competitors of his doped racehorses. (Fishman PSR at 4–5; Dkt. 727 at 45–48; Dkt. 875 at 9). The Government asked the District Court to impose that same restitution on

56

Fishman, jointly and severally, as well as another $11,268,177 in restitution related to the Count Two conspiracy. (Dkt. 875 at 9–10). Fishman objected, arguing that, "because a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss—something the government cannot establish in any event—there can be no restitution award in this case." (Dkt. 888 at 13). At sentencing, Fishman added that Navarro's stipulation might be excessive because it is "assume[d], A, that all of Navarro's winners were doped; and B, that all of Navarro's winners were doped with drugs provided by Fishman or one of his conspirators . . . ." (Fishman A. 303). The District Court disagreed, explaining that, "[o]nce you are a coconspirator with someone and they are responsible for a loss amount, you are jointly and severally liable for all that amount," and "Navarro is a coconspirator and Navarro has admitted that those horses were doped." (Fishman A. 303).

The District Court determined that it could reasonably find the losses by a preponderance of the evidence for the Count One conspiracy, but not the Count Two conspiracy (Fishman A. 302), and imposed $25,860,514 in restitution, jointly and severally with Navarro and any other defendant convicted of violating Count One (Fishman A. 353).

On appeal, Fishman argues that Judge Vyskocil erred by imposing *any* restitution because the "racetracks *did not suffer a pecuniary loss* because if they didn't pay the purse to Navarro, they would have had to pay the purse to another trainer and owner."

(Fishman Br. 52 (emphasis in original)). Fishman also argues that doping horses did not ensure their victory, "so no one could know whether the administration of PEDs to Navarro's horse was the determining factor" in victory. (Fishman Br. 52–53). Fishman is incorrect: as Navarro admitted, the racetracks paid money to him that they should not have paid, and so lost that money. The District Court did not err, much less abuse its considerable discretion, in ordering restitution to the racetrack victims.

## A. Applicable Law

The Mandatory Victim Restitution Act (the "MVRA") provides for mandatory restitution by a defendant convicted of a property offense under Title 18, "including any offense committed by fraud or deceit," where "an identifiable victim" has suffered a "pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). Under the MVRA, any person "directly and proximately harmed as a result of the commission of an offense" or "directly harmed by the defendant's criminal conduct in the course of [a] scheme, conspiracy, or pattern" of criminal activity is a "victim" entitled to restitution. 18 U.S.C. § 3663A(a)(2). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); *see also United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011). "[T]he MVRA caps the restitution award at the actual amount of the victim's loss," *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015), but "the

58

calculation of these losses need not be mathematically precise," *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016). A district court must make only "a reasonable estimate" of a victim's loss "based on the evidence before it." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007); *see also United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) ("[A] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable.").

This Court "review[s] an MVRA order of restitution deferentially," and will "reverse only for abuse of discretion." *Gushlak*, 728 F.3d at 190. Review of restitution orders is "extremely deferential." *United States v. Grant*, 235 F.3d 95, 99 (2d Cir. 2000). Extreme deference is warranted "because ordering restitution requires a delicate balancing of diverse, sometimes incomparable, factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a hunch." *United States v. Rossi*, 592 F.3d 372, 376 (2d Cir. 2010); *see also United States v. Ismail*, 219 F.3d 76, 78 (2d Cir. 2000) ("Because a restitution order requires a delicate balancing of diverse, sometimes incomparable factors, . . . the sentencing court is in the best position to engage in such balancing, and its restitution order will not be disturbed absent abuse of discretion."). A district court has "power to address practical problems in the implementation of restitution orders . . . ." *United States v. Park*, 33 F. App'x 1, 2 (2d Cir. 2002).

To find an abuse of discretion, this Court must conclude that the restitution award rests "on an error of

law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *United States v. Pearson*, 570 F.3d 480, 486 (2d Cir. 2009); *accord Gushlak*, 728 F.3d at 190.

## B. Discussion

Racetracks paid money to Navarrobecause of the fraud that he and Fishman committed. Navarro won races because his racehorses used Fishman's illegal drugs; he and Fishman texted one another about the "big part" Fishman played in those victories. (Fishman Tr. 693–94; GX 401-K; Fishman PSR ¶ 79). Additionally, Fishman enabled Navarro and others to avoid detection of illegal doping, which he advertised. For example, Fishman e-mailed a co-conspirator: "I have many products and not sure which is best. As for doping I make all my products non testable." (GX 3402). Had the racetracks or authorities discovered Navarro's and Fishman's doping scheme, the doped horses—including Navarro's horses—would have been disqualified, and Navarro and the doped racehorses would not have won their purses. (Fishman Tr. 632; *see also* Fishman Tr. 805–06 (a trainer explaining that, if she had been caught doping a racehorse, she would have been suspended and would not be allowed to keep her purse money)). At Navarro's sentencing, the Government explained that: (1) $25,860,514 represented "purse winnings to Navarro for Navarro-trained horses that won races that never should have received purse winnings because they were dosed"; (2) even if the racetracks would have paid purses to the owners of other horses, "[a]s a practical and legal matter, the racetracks are going to end up being the clearinghouse

60

for claims" because other competitors will seek the winnings to which they were entitled; and (3) providing restitution to the racetracks "will provide a mechanism by which the racetracks can rectify the wrongs that have been caused." (Dkt. 727 at 45–48). Navarro did not object to any of those representations and the District Court entered an order of restitution. (*Id.* at 48–49).

At Fishman's sentencing, the District Court properly relied on its findings from Navarro's sentencing. Components of a restitution calculation may be based on "mere probabilities, expectations, guesswork, even a hunch." *Rossi*, 592 F.3d at 376. Given those principles—coupled with the "extreme[ ] deferenc[e]" afforded the sentencing court's restitution determination, *Grant*, 235 F.3d at 99—the District Court's crediting and relying on the basis of a co-conspirator's purse winnings was not an abuse of discretion.

Fishman's central argument is simple: because the racetracks would have had to pay a purse out to *somebody*, they did not suffer losses when they paid a purse out to Navarro. (Fishman Br. 50–53). This is not correct; the racetracks lost money when they paid Navarro in spite of the fact that he was not entitled to the race purses. *See, e.g.*, *United States v. Leahy*, 464 F.3d 773, 787–789 (7th Cir. 2006) (rejecting challenge to sufficiency of indictment where defendants falsely represented critical qualifications in order to obtain government contracts, despite defendants' argument that the victim received "a service worth every dime in the contracts").

61

This case is similar to *United States v. Woodard*, in which the Atlanta Police Department seized and held property and money, and the defendants defrauded Atlanta into giving them—rather than the rightful owners—that property and money. 459 F.3d 1078, 1082–83 (11th Cir. 2006). Like here, the defendants argued on appeal that restitution to Atlanta was improper, since the rightful owners of the property and money were the true identifiable victims. *Id.* at 1087–88. The Eleventh Circuit rejected that argument, explaining that "the City was a victim of Defendants' fraudulent scheme," "it would be impractical to separate loss amounts for individual claimants for restitution purposes," and, "[a]lthough the City had no property interest in the money it paid to [the defendants' entity], the City was responsible for that money, and the City is required to repay the money to its rightful owners. The district court did not err in ordering restitution to the City." *Id.* So too, here. The very purpose of the Navarro scheme was to cause the racetracks to pay Navarro purses to which he was not entitled, whether because his horses should not have won the races, or because they should have been disqualified. The racetracks paid, and were therefore victims. The racetracks "were responsible for that money, and the [racetracks are] required to repay the money to its rightful owners." *Id.*

This does not mean that the competitors defeated by Navarro's doped horses were not *also* victims of Fishman's fraud. But as the Government explained and the District Court accepted at Navarro's sentencing, in ordering restitution to the racetracks, "[a]s a practical and legal matter, the racetracks are going to

62

end up being the clearinghouse for claims. . . . [T]his was the most practical resolution of attempts to get these monies back to those competitors." (Dkt. 727 at 47; *see also id.* at 48 ("[T]he other competitors are going to go to the racetracks . . . to attempt to receive these funds. . . . And this will provide a mechanism by which the racetracks can rectify the wrongs that have been caused.")). Ordering restitution to the racetracks was well within the District Court's "power to address practical problems in the implementation of restitution orders . . . ." *Park*, 33 F. App'x at 2.

Fishman also argues that the District Court should not have relied on Navarro's agreement that his doped racehorses had earned over $25 million because that agreement was not a statement of a co-conspirator made in furtherance of the conspiracy and because "Navarro had to agree to make this preposterous restitution in order to secure a [favorable] plea." (Fishman Br. 53). However, the rules of evidence do not apply at sentencing, of which restitution is a part. FED. R. EVID. 1101(d)(3); *see also, e.g.*, *Rossi*, 592 F.3d at 376 (explaining that restitution may be based on a variety of considerations, many of which would not necessarily be admissible at trial)."). A court can consider hearsay evidence at sentencing, *United States v. Martinez*, 413 F.3d 239, 243–44 (2d Cir. 2005), and can rely upon testimony from related proceedings, provided the defendant has a meaningful opportunity to respond (which he did here), *Concepcion*, 983 F.2d at 387–88. And Fishman offered nothing—and continues to offer nothing—beyond pure speculation that Navarro's agreed-upon numbers might not be accurate. (Fishman A. 331–32; Fishman Br. 53).

63

Finally, Fishman argues that the District Court abused its discretion by not holding an evidentiary hearing on restitution. (Fishman Br. 54–55). However, no further restitution hearing was required given the written and oral submissions on restitution at Fishman's sentencing, the record evidence, the District Court's having presided over Fishman's and Giannelli's trials, Navarro's admissions, and the District Court's findings at Navarro's earlier public sentencing. *See, e.g.*, *United States v. Baig*, 669 F. App'x 587, 588 (2d Cir. 2016) (noting that at sentencing "a full-blown evidentiary hearing is not required so long as the defendant is given an adequate opportunity to present his position as to matters in dispute.").

## POINT V

### The District Court Did Not Plainly Err by Ordering Forfeiture

The Indictment included forfeiture allegations with regard to Counts One and Two. (Fishman A. 176–78; Fishman PSR ¶¶ 7–8). Fishman's Presentence Report recommended forfeiture of $13,503,176.20. (Fishman PSR ¶ 181 and at 37). The Government submitted a proposed preliminary order of forfeiture before sentencing. (Fishman A. 277–79). Fishman did not object to forfeiture—or argue that it was unavailable—either before or during Fishman's sentencing; rather, after prompting from the District Court, at his sentencing hearing, Fishman raised a concern about "the addition that leads [the Government] to the number of $13.5 million in total" because he had numbers that "don't quite add up to the numbers given." (Fishman A. 279).

64

Fishman therefore asked that, "with regard to forfeiture, that the Court set a date for a hearing, should we regard one as necessary, because I believe that after some further discussion with [the Government], we can resolve this without the need for a hearing. We're just not prepared to accept this number today." (Fishman A. 280). Accordingly, the parties jointly proposed that the District Court enter an order of forfeiture, but leave open the possibility of whether the amount of forfeiture had to be recalculated. (Fishman A. 333). Judge Vyskocil agreed to do so. (Fishman A. 358–59; *see also* Fishman A. 360 (the Government stating, without objection from Fishman, that "the Court has indicated that it does intend to impose forfeiture here, even if the final sum is to be determined.")). Other than the agreed-upon carve-out for litigating the precise math underlying the forfeiture order, that order of forfeiture was final. FED. R. CRIM. P. 32.2(b)(4)(A) ("At sentencing . . . the preliminary forfeiture order becomes final as to the defendant.").

Two months after the District Court entered an order of forfeiture, Fishman raised a new objection: that "[t]he forfeiture sought here is not authorized by statute and is therefore unlawful in its entirety." (Fishman A. 382). The District Court found that Fishman had waived or forfeited any objection to the legality of forfeiture (SA 66–69), although it also found that forfeiture was, in fact, legal and applicable (SA 69–73). However, after an evidentiary hearing (Dkt. 1075), the District Court reduced the amount of forfeiture to $10,312,627.40 (SA 88).

65

On appeal, Fishman argues only that "[f]orfeiture [i]s [n]ot [a]uthorized for FDCA [c]onvictions"; he does not dispute the amount of the forfeiture. (Fishman Br. 62–71). He is wrong: the FDCA authorizes civil forfeiture, which means that, by statute, criminal forfeiture is also available in a criminal prosecution.

## A. Applicable Law

The FDCA provides for civil forfeiture: "[a]ny article of food, drug, or cosmetic that is adulterated or misbranded . . . shall be liable to be proceeded against . . . on libel of information and condemned . . . ." 21 U.S.C. § 334(a)(1). The statute sets forth instructions regarding the disposition of property after a "condemnation," identifying such proceedings as forfeitures: "disposition of goods after decree of condemnation; claims for remission or mitigation of *forfeitures*." 21 U.S.C. § 334(d)(1) (emphasis added).

Where civil forfeiture is available, criminal forfeiture is also authorized:

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case . . . . The procedures in [21

66

U.S.C. § 853] apply to all stages of a criminal forfeiture proceeding . . . .

28 U.S.C. § 2461(c). That statute "authorizes criminal forfeiture as a punishment for any act for which civil forfeiture is authorized, and allows the Government to combine criminal conviction and criminal forfeiture in a consolidated proceeding." *United States v. Razmilovic*, 419 F.3d 134, 136 (2d Cir. 2005). Accordingly, Section 2461(c) incorporates the procedures applicable to criminal forfeiture cases, including Section 853(p), which requires courts to forfeit "any other property of the defendant, up to the value of any property" that "as a result of any act or omission of the defendant" is no longer readily available. 21 U.S.C. § 853(p); *see also*, *e.g.*, *United States v. Seabrook*, 661 F. App'x 84, 86 (2d Cir. 2016) (Section "2461(c) provides that the 'procedures' in 21 U.S.C. § 853 apply to 'all stages of a criminal forfeiture proceeding,' and thus § 853(p)'s substitute asset provisions apply as well."); *United States v. Bermudez*, 413 F.3d 304, 306 (2d Cir. 2005).

Section 853(p) authorizes imposition of a forfeiture money judgment in place of directly forfeitable property that can no longer be located. *See United States v. Awad*, 598 F.3d 76, 78–79 (2d Cir. 2010) (per curiam) ("We join our sister courts of appeal in holding that § 853 permits imposition of a money judgment on a defendant . . ." and holding that criminal forfeiture actions "need not be traced to identifiable assets in a defendant's possession."). Moreover, "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes." 21 U.S.C. § 853(o).

## B. Discussion

### 1. Fishman Forfeited His Objection to the Lawfulness of Forfeiture

Where a defendant fails to object to forfeiture below, this Court "review[s] the forfeiture order for plain error." *United States v. Goldberg*, 661 F. App'x 33, 37 (2d Cir. 2016). Fishman did not object to the legality of forfeiture before sentencing. He did not object to the legality of forfeiture at sentencing. Rather, in response to the District Judge's *sua sponte* questions, he preserved only an objection to the *calculation* of forfeiture:

> I believe I understand the government's methodology, but I would request on behalf of my client an effort to *indicate the addition that leads them to the number of $13.5 million in total.*

> I'll note that we have certain information that comes from my client's tax returns and what we regard as the gross revenues of the company, Equestology, over a certain period, and *they don't quite add up to the numbers given.*

> \* \* \*

> My proposal was going to be that with regard to forfeiture, that the Court set a date for a hearing, should we regard one as necessary, because I believe that after some further discussion with Ms. Mortazavi, we can resolve this without the

> need for a hearing. *We're just not pre-pared to accept this number today.*

(Fishman A. 279–80 (emphasis added)). Accordingly, after the parties conferred (Fishman A. 329), they jointly recommended "that the Court may enter the order of forfeiture in the amount proposed by the government of approximately $13 million," but also that "the defense be given 30 days within which to submit a letter to the Court as to whether it has a revised proposed forfeiture figure or whether it consents to the forfeiture figure in the government's calculation" (Fishman A. 333). The District Court did as the parties asked, ordering forfeiture, but allowing Fishman 30 days "to file any application to modify that order." (Fishman A. 353). When the Court issued the forfeiture order (Fishman A. 371–74), it "retain[ed] jurisdiction to . . . amend it as necessary" (Fishman A. 374), but did not indicate in any way that it was leaving open whether forfeiture itself was lawful. Other than the carve-out as to calculation of forfeiture to which the parties and the Court all agreed, that forfeiture order was "final." FED. R. CRIM. P. 32.2(b)(4)(A) ("At sentencing . . . the preliminary forfeiture order becomes final as to the defendant."). Accordingly, Fishman failed to preserve any objection to the legality of forfeiture before sentencing.

Without citing any case law beyond general statements about forfeiture being part of sentencing, or discussing the fact that he explicitly asked that only one aspect of forfeiture—the method of calculating his gross receipts—be left open, Fishman asserts, as *ipse dixit*, that the "forfeiture hearing was in effect a

continuance of the sentencing." (Fishman Br. 71). Except that it was not; rather, the parties agreed that Rule 32.2 would allow them to leave open one single aspect of forfeiture. (Fishman A. 333). Forfeiture was otherwise final, *see* FED. R. CRIM. P. 32.2(b)(4)(A), and Fishman has cited no law for the proposition that he could retroactively preserve an objection already forfeited.

Because Fishman did not preserve his objection to the lawfulness of forfeiture, this Court reviews that argument on appeal for plain error.

## 2. The District Court Did Not Commit Plain Error

The District Court did not err, much less commit plain error, by imposing forfeiture. First, even if there were error—and there was not—it could not have been plain error, as Fishman does not identify any "binding precedent from the Supreme Court or this Court" establishing that the FDCA does not permit criminal forfeiture. *Hunt*, 82 F.4th at 139.

Second, there was no error. Because Section 2461(c) establishes that, where civil forfeiture is available, criminal forfeiture is authorized, and because Section 853(p) authorizes imposition of a forfeiture money judgment in place of directly forfeitable property that can no longer be located, the question is simple: does the FDCA authorize civil forfeiture?

The answer is just as simple: yes, the FDCA authorizes civil forfeiture. The "condemn[ation]" of property authorized by Section 334(a)(1) is a forfeiture; Section 334 itself refers to condemnations and

70

forfeitures as interchangeable proceedings. *See* 21 U.S.C. § 334(d)(1) ("[D]isposition of goods after decree of condemnation; claims for remission or mitigation of forfeitures."), 334(d)(3) (with respect to property other than drugs, "[w]henever . . . the condemnation of any equipment or thing (other than a drug) is decreed, the court shall allow the claim of any claimant . . . for remission or mitigation of such forfeiture if such claimant proves" certain factors). The long established, "normal rule of statutory construction [dictates] that identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990). Thus, where Section 334(d) equates a "condemnation" with "forfeiture," the "normal" presumption is that "condemnation" carries the same meaning in Section 334(a).

Not surprisingly, many courts, including this Court, have historically referred to "condemnations" and "forfeitures" interchangeably. *See United States v. Morris*, 23 U.S. 246, 248 (1825) (referring to the "condemnation" of certain goods, later referenced as "said forfeiture"); *Lee v. Thornton*, 538 F.2d 27, 32 (2d Cir. 1976) (referring to "condemnation proceedings" and "forfeiture proceedings" interchangeably); *United States v. 52 Drums Maple Syrup*, 110 F.2d 914, 915 (2d Cir. 1940) (referring to "the government's right to forfeit" adulterated syrup in context of "condemnation proceedings" brought by the Government). Indeed, Courts condemning food, cosmetics, and adulterated and misbranded drugs under Section 334 have frequently referred to such condemnation as "forfeiture." *See, e.g.*, *United States v. Eight Unlabeled Cases, more or less, of an Article of Cosm.*, 888 F.2d 945, 949 (2d

71

Cir. 1989); *United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1351 (11th Cir. 2019); *United States v. Kanasco, Ltd.*, 123 F.3d 209, 210–11 (4th Cir. 1997); *United States v. Articles of Drug for Veterinary Use*, 50 F.3d 497, 499 n.2 (8th Cir. 1995); *United States v. Articles of Drug*, 826 F.2d 564, 573 (7th Cir. 1987); *United States v. An Article of Food*, 752 F.2d 11, 14 (1st Cir. 1985).

Because Section 334 authorizes the civil forfeiture of property, "the court shall order the forfeiture of the property as part of the sentence in the criminal case," 28 U.S.C. § 2461(c), and such forfeiture may give rise to a money judgment, 21 U.S.C. § 853(p).

Fishman's arguments otherwise are unavailing. First, Fishman argues that 18 U.S.C. § 983 "defines 'civil forfeiture statute' and excludes" the FDCA. (Fishman Br. 65 (citing 18 U.S.C. § 983(i)(2)(C))). By their own terms, however, the procedures set forth in Section 983 (and Section 981) apply only to certain civil forfeiture statutes—typically ones that do not have their own civil forfeiture provisions—but do not purport to dictate that other statutes do not permit civil forfeiture. By way of example, Section 983 also exempts "the Tariff Act of 1930 or any other provision law codified in Title 19" and "the Trading with the Enemy Act (50 U.S.C. 4301 et seq.)" from its definition of civil forfeiture statutes. 18 U.S.C. § 983(i)(2)(A) & (D). Each of these has its own civil forfeiture provisions.

72

*See* 19 U.S.C. §§ 1609 and 1610;[18] 50 U.S.C. § 4315(b)(2).[19] Simply put, the forfeiture provisions of 18 U.S.C. §§ 981, *et seq.*, do not purport to be the *sole* bases for civil forfeiture; rather, they simply provide one basis. For example, this Court has affirmed civil forfeiture under 19 U.S.C. § 1595a—which is explicitly excluded from the scope of Section 983, *see* 18 U.S.C. § 983(i)(2)(A)—explaining that "the phrase 'civil forfeiture statute'" in Section 983 is a "specifically defined . . . term of art with a meaning narrower than its more natural purport," applicable only to Section 983. *United States v. Davis*, 648 F.3d 84, 94–95 (2d Cir. 2011).

Fishman also argues that "Section 2461(c) does not expand the scope of forfeiture," "Section 853(p) . . . permits the forfeiture of untainted substitute assets, but only if the property is subject to forfeiture pursuant to 21 U.S.C. § 853(a)," and Section 853(a) "does not

---

[18] Section 1610 refers to "judicial forfeiture proceedings" as "proper proceedings for the condemnation of such property," once again showing the interchangeability of those terms. 19 U.S.C. § 1610.

[19] For similar reasons, Fishman errs in claiming that Section 334 must not permit civil forfeiture because it is not incorporated by the general civil forfeiture statute, 18 U.S.C. § 981. (Fishman Br. 66–67). Like with Section 983, Section 981 largely provides for civil forfeiture for statutes that do not have their own forfeiture provisions. Section 981, for example, does not reach Title 19, even though it has its own civil forfeiture provisions. *See* 19 U.S.C. §§ 1609 and 1610.

include condemned misbranded property." (Fishman Br. 65–66). This crabbed reading of the statutes improperly looks at each in isolation. It is true that Section 853(a) does not, on its own, reach condemned misbranded property; indeed, on its own, it only reaches certain subchapters of the Controlled Substances Act. 21 U.S.C. § 853(a). However, Section 2461 *does* reach all "Act[s] of Congress for which the civil or criminal forfeiture of property is authorized," provides for criminal forfeiture "pursuant to . . . the Federal Rules of Criminal Procedure," and incorporates the "procedures" of Section 853, which procedures include the substitute asset/money judgment procedures in Section 853(p). 28 U.S.C. § 2461(c).[20] That is why this Court "reject[ed the] argument that [the] substitute assets provision of § 853(p) applies only to property as defined by § 853(a)." *Seabrook*, 661 F. App'x at 86 (citing *Bermudez*, 413 F.3d at 306).

In short, (1) the FDCA provides for civil forfeiture, 21 U.S.C. § 334(a); (2) Section 2461 authorizes criminal forfeiture for violations of law that provide for civil forfeiture; and (3) Section 853(p), as incorporated by Section 2461, allows for substitution of assets or a money judgment where the forfeitable property is no longer available. The statutory scheme authorized the District Court to impose forfeiture.

---

[20] Congress knows how to carve out parts of Section 853 when it wants to do so; Section 853(d) "applies only in cases in which the defendant is convicted of a violation of" the Controlled Substances Act. 28 U.S.C. § 2461(c). It did not carve out Section 853(p).

74

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:    New York, New York
             January 31, 2024

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                          *of America.*

DAVID R. FELTON,
MICHAEL D. MAIMIN,
SARAH MORTAZAVI,
    *Assistant United States Attorneys,*
           *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 18,266 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: MICHAEL D. MAIMIN,
*Assistant United States Attorney*